Sherwin S. STERN, Plaintiff-Appellee,

v.

UNITED STATES GYPSUM, INC., et al., Defendants-Appellants.

No. 76–1070.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 21, 1976.

Decided Jan. 12, 1977.

Edward S. Silber, George E. Bullwinkle and William G. Schopf, Jr., Chicago, Ill., for defendants-appellants.

Robert Weinberg, Robert M. Tobias, Washington, D. C., Harvey M. Silets, Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, PELL and WOOD, Circuit Judges.

PELL, Circuit Judge.

■ This interlocutory appeal, taken pursuant to 28 U.S.C. § 1292(b), from the district court's order denying defendants' motion to dismiss for lack of subject matter jurisdiction, presents questions of first impression [1] in the construction of 42 U.S.C. § 1985(1).[2] The first count of plaintiff

---

1. In *Kletschka v. Driver,* 411 F.2d 436, 446 (2d Cir. 1969), the court stated that § 1985(1) "apparently has never been construed by a court . . . ." The parties have cited no authorities construing the provision, and our research has disclosed none. *See also* C. Antieu, Federal Civil Rights Acts § 94, at 124 (1971).

2. Section 1985(1) defines conspiracies, for which Section 1985(3) establishes a private right of action, in these terms:

 If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or

Stern's complaint purports to state a claim arising under that section, and accordingly asserts jurisdiction under 28 U.S.C. §§ 1331(a) and 1343(1), (2), and (4). The second and third counts allege state law claims, sounding in defamation and malicious interference with Stern's contract rights, respectively. As to these counts, Stern invokes the jurisdiction of the federal courts under the doctrine of pendent jurisdiction. That doctrine, based on considerations of fairness and judicial economy, recognizes power in the federal courts to resolve a state law claim brought in conjunction with a federal claim where both "derive from a common nucleus of operative fact." [3] *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 (1966). Because it is the federal claim that provides the basis for the exercise of pendent jurisdiction, that claim "must have substance sufficient to confer subject matter jurisdiction on the court." *Id.*

■ Defendants-appellants do not argue that the district court would lack jurisdiction to resolve all the issues raised in Stern's complaint *if* the complaint sufficiently alleged a cause of action under Section 1985(1). Instead they insist that the complaint does not do so; and because it reveals on its face a lack of diversity of parties, there is no available basis for federal jurisdiction. Stern, in response, offers no alternate jurisdictional theories but rests on the claim that his complaint does state a cause of action under Section 1985(1). The sole and dispositive issue presented, then,

while jurisdictional in its effect, is simply whether or not the complaint states a claim upon which relief under Section 1985(1) can be granted. In deciding that issue, we proceed under the accepted rule for determining the sufficiency of a complaint, that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted).

The well-pleaded material allegations of the complaint, liberally read and accepted for the purposes of this appeal as true, *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174–75, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), present the following facts. Plaintiff-appellee Stern is, and was at all material times, an agent of the federal Internal Revenue Service (IRS). In February 1972 the Chicago District Office of the IRS began an audit of United States Gypsum, Inc. (USG), one of the defendants-appellants; [4] and Stern, in his capacity as a large case manager for the IRS, was placed in charge of the team of revenue agents conducting the audit. Stern at that time enjoyed the highest professional reputation. Defendants-appellants Dykes, Hogan, and Heffernan, at all material times the Executive Vice President, Treasurer, and Tax Manager, respectively, of USG, conspired to injure Stern on account of the lawful performance of his official duties and to molest, interrupt, hin-

---

impede him in the discharge of his official duties;

The remedial provision of § 1985(3) is as follows:

[I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

3. There are, in addition, certain discretionary considerations which might properly lead a district court to decline to exercise pendent jurisdiction, *United Mine Workers, supra*, 383 U.S. at 726–27, 86 S.Ct. 1130, but defendants-appellants did not argue any such grounds in the district court and they do not do so here. They seek to avoid all exercise of federal jurisdiction, not merely to limit its scope to federal issues.

4. The alleged liability of USG is based on a theory of respondeat superior and derives solely from the activity of the individual defendants-appellants, Dykes, Hogan, and Heffernan, on behalf of and for the benefit of and within the scope of their responsibilities as officers and agents of USG.

der, and impede him in the performance of those duties. To accomplish these ends, Dykes, Hogan, and Heffernan knowingly and maliciously fabricated false and defamatory charges of serious professional misconduct by Stern in the course of the USG audit,[5] and communicated or caused to be communicated these charges to Stern's IRS superiors. As a result, in March 1974 Stern was removed from his assignment on the USG audit. Thereafter, a notice of adverse employment action was issued to Stern, proposing a reduction in grade, salary, and responsibility and a geographic transfer.[6] His professional reputation, alleged to be peculiarly necessary for the practice of his profession, was seriously injured, his opportunities for advancement have been irreparably limited, and he has suffered humiliation, mental anguish, and physical and emotional distress.

The district court determined that these allegations stated a cause of action under 42 U.S.C. § 1985(1), and concluded therefore that it had jurisdiction of the case. In attempting to persuade us otherwise, defendants-appellants make a number of arguments: (1) there can be no conspiracy between the agents of a single corporate taxpayer; (2) the complaint does not allege violence, intimidation or threat of the direct and illegal nature contemplated by § 1985(1); (3) § 1985(1) provides a remedy only for federal officials injured in attempting to enforce the provisions of the Fourteenth Amendment to the Constitution; (4) the requirement of an invidiously discriminatory conspiratorial animus, which has been applied to § 1985(3), should be applied to § 1985(1) as well, and Stern has alleged no such animus; and (5) if § 1985(1) applies to the facts of this case, it unconstitutionally infringes on the right to petition the

Government for a redress of grievances. We will consider each argument in turn.

## I. The Intra-Corporate Conspiracy Question

A necessary element of a cause of action under § 1985(1) is that "two or more persons in any State or Territory conspire . . . ." Relying on this court's decision in *Dombrowski v. Dowling*, 459 F.2d 190 (7th Cir. 1972) (interpreting 42 U.S.C. § 1985(3)), appellants insist that Stern's complaint is fatally deficient in this regard, because the named conspirators were all officers or agents of USG and no conspiracy can be found in the business decisions of a single corporation, even if, as is often true, more than one corporate agent participated in making them. Stern disputes this argument on its merits.

We do not decide the question thus presented, for appellants did not present this theory to the district court, it was not part of the controlling question of law certified by that court, and appellants did not include it in the grounds supporting their petition for leave to appeal to this court. It is a well-settled general proposition that "a litigant cannot present to this court as a ground for reversal an issue which was not presented to the trial court and which it, therefore, had no opportunity to decide." *Desert Palace, Inc. v. Salisbury*, 401 F.2d 320, 324 (7th Cir. 1968); *Hamilton Die Cast, Inc. v. United States Fidelity and Guaranty Company*, 508 F.2d 417, 420 (7th Cir. 1975).

To be sure, this rule has narrow exceptions, *e. g.*, where jurisdictional questions are presented or where, in exceptional cases, justice demands more flexibility. *Federal Savings and Loan Insurance Corpo-*

---

5. While the allegations of the charges of misconduct assume some variation of verbiage in the complaint, generally they take the form of accusations that Stern had prior to the completion of the audit put an improper offer of settlement before USG, had threatened USG in an effort to coerce a settlement, and had indicated that failure to settle would be followed by long and expensive investigations by the IRS and other governmental agencies.

6. Stern represents to this court that, since the filing of the complaint, an IRS investigation of the charges was terminated, the charges were dismissed, and Stern was not demoted. Because actual injury prior to that time as well as continuing injury are alleged, of course, this fact has no relevance in assessing the sufficiency of the complaint.

*ration v. Quinn,* 419 F.2d 1014, 1019 (7th Cir. 1969). Appellants argue that the lack of a federal claim which flows from an inadequate conspiracy allegation is, in this case, jurisdictional. Additionally, they point out that most of the cases establishing the general rule cited here arose on direct appeal of a final judgment, *but see Barrett v. Browning Arms Company,* 433 F.2d 141, 144 (5th Cir. 1970) (same rule applied to interlocutory appeal), and that different policy considerations apply to interlocutory appeals. In such cases, appellants suggest, the interests of justice and judicial economy are better served by considering all issues raised, whether presented to the court below or not.

▬ At least in the circumstances of this case, we find appellants' arguments unpersuasive. If appellants had raised this conspiracy theory before the district court, and if that court had found *Dombrowski, supra,* to be controlling and had dismissed the complaint, Stern would have had the opportunity to seek leave to amend his complaint. Fed.R.Civ.P. 15(a). Rule 15(a) provides that "leave shall be freely given when justice so requires," and this circuit has adopted a liberal policy respecting amendments to pleadings so that cases may be decided on the merits and not on the basis of technicalities. *Fuhrer v. Fuhrer,* 202 F.2d 140, 143 (7th Cir. 1961); *Asher v. Harrington,* 461 F.2d 890, 895 (7th Cir. 1972). As was stated in *Fuhrer v. Fuhrer, supra,* at 143, "[l]eave to amend should be freely given unless it appears to a certainty that plaintiff would not be entitled to any relief under any state of facts which could be proved in support of his claim." Stern has represented to this court that he would have sought leave to amend if it had become necessary, and, specifically, that at the time of the district court's order, he had acquired information justifying an allegation that persons neither employed by nor agents of USG participated in the conspiracy. Because such an amended allegation would cure the asserted *Dombrowski* deficiency in the complaint, this would appear to be a classic case for application of the liberal leave-to-amend policy; in any event,

we will not assume that the district court, to which the matter was never presented, would decide otherwise. This case in its present posture indicates to us both the soundness of the general rule limiting appellate review to issues presented below and the undesirability of departing from it here.

## II. An Overview of the Legislative History of § 1985(1)

Each of the appellants' remaining three nonconstitutional arguments, in its own way, draws heavily on the historical conditions in which Congress passed the Act of April 20, 1871, ch. 22, 17 Stat. 13, of which 42 U.S.C. § 1985(1) was a part. Each invites this court to construe § 1985(1) narrowly in light of those conditions. We think it will be helpful, before considering these arguments individually, briefly to consider this general historical and legislative context.

Much of the tone of appellants' contentions is expressed in their assertion that "the circumstances alleged by Stern are simply of a whole different world from that addressed by the 42nd Congress." That much, we agree, is indisputable. The Act of April 20, 1871 (often referred to as the Ku Klux Klan Act) was enacted by a Congress acutely aware of the massive and frequently violent resistance in the southern states to federal Reconstruction after the Civil War. The Congressional debates on the Act are literally packed with tales of outrage: murders, whippings, banishments, rapes, house burnings, and other egregious acts were repeatedly and emotionally discussed. *See, e. g.,* Cong.Globe, 42d Cong., 1st Sess. 245–48, 320–21, 369, 374, 428, 436 (1871). The inability or unwillingness of state governments to deal effectively with these problems led many members of the Congress to characterize the times as presenting a condition of war, *id.* at 339, and *see id.* at 246–47, a state of anarchy, *id.* at 321, and a "grave and momentous crisis," *id.* at 248. In all of this, the widespread, powerful, and secret Ku Klux Klan played a leading role, as an extensive report which was then before the Congress demonstrat-

ed, S.Rep.No.1, 42d Cong., 1st Sess. (1871), and as was often recognized in the debates. *See, e. g.,* Cong.Globe, 42d Cong., 1st Sess. 247, 369, App. 166–67 (1871).

In the light of this context, we have no difficulty accepting the proposition that the immediate attention of the Forty-Second Congress was focused on circumstances which bear little resemblance to the facts alleged in Stern's complaint. It would, in fact, surprise us if any member of that Congress ever specifically contemplated the application of the provisions which became § 1985(1) to a conspiracy to defame and discredit a revenue officer to his superiors.

 This conclusion is relevant to our determination, but it cannot alone be conclusive. We recognize that " 'courts, in construing a statute, may with propriety recur to the history of the times when it was passed'." *Great Northern Railway Co. v. United States,* 315 U.S. 262, 273, 62 S.Ct. 529, 533, 86 L.Ed. 836 (1942), quoting *United States v. Union Pacific Railroad Company,* 91 U.S. 72, 79, 23 L.Ed. 224 (1876). But Congress surely may use the lesson of a particular historical period as the catalyst for a law of more general application. For this reason, among others, the rule is well established that construction of a statute begins with its language; indeed, where there is no ambiguity in statutory language, there may be no need to refer to legislative history at all. *Ex parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949); *American Community Builders, Inc. v. Commissioner of Internal Revenue,* 301 F.2d 7, 13 (7th Cir. 1962).[7]

Because two of appellants' arguments urge for § 1985(1) historical limitations not apparent in its terms,[8] we think it important to note here that Congress, in enacting what became § 1985(1), did not fashion a narrow and limited remedy applicable only to the southern states in 1871. The outrageous conditions there at that time were, no doubt, what induced Congress to act, but it chose to do so with a statute cast in general language of broad applicability, *see Monroe v. Pape,* 365 U.S. 167, 175–76, 183, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (making the same point with reference to 42 U.S.C. § 1983, which was also part of the Act of April 20, 1871), and unlimited duration.[9] As a court, and not a legislature, we should honor that choice unless it produces results so unreasonable or so arguably unconstitutional that the Congress may not be presumed to have intended them. Other civil rights enactments from the same historical period are helpfully analogous. We think it fair to say that some of these, notably, *e. g.,* 42 U.S.C. § 1983 (providing a private remedy for deprivations of federal rights under color of state law), have been invoked by resourceful plaintiffs in factual settings utterly unlike those prevailing in 1871 and in all probability entirely unforeseen by the Forty-Second Congress. Yet where the statutory language has been satisfied, such lawsuits have generally been sustained. As the Supreme Court stated in *Griffin v. Breckenridge,* 403 U.S. 88, 97, 91 S.Ct. 1790, 1796, 29 L.Ed.2d 338 (1971),

[t]he approach of this Court to . . . Reconstruction civil rights statutes in the

---

**7.** On the other hand, of course, there is no rule of law *precluding* legislative history analysis just because of language appears to be clear. *Cass v. United States,* 417 U.S. 72, 78–79, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974). The opinion of this court in *United States v. United States Steel Corporation,* 482 F.2d 439, 444 (7th Cir. 1973), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147, suggests a continuum analysis, which proceeds from the premise that "the plainer the language, the more convincing contrary legislative history must be."

**8.** These arguments are considered in parts IV and V of this opinion, *infra.*

**9.** Appellants argued, with reference to the contextual gloss they would apply to § 1985(1), that it was originally conceived that the legislation would die a natural death in a few years' time. This contention is belied by the legislative history. President Grant's message to the Congress, which was the immediate stimulus for the legislation, did suggest that it might be advisable to impose a durational limit on the new law, Cong.Globe, 42d Cong., 1st Sess. 244 (1871), and in fact such a limit was placed on one of the sections of the law, Act of April 20, 1871, ch. 22, § 4, 17 Stat. 14–15; this, of course, was not done with the provisions which became § 1985(1).

years since *Collins* [*v. Hardyman,* 341 U.S. 651 [71 S.Ct. 937, 95 L.Ed. 1253] (1951)] has been to "accord [them] a sweep as broad as [their] language." *United States v. Price,* 383 U.S. 787, 801 [86 S.Ct. 1152, 1160] 16 L.Ed.2d 267; *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437 [88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189].

### III. Force, Intimidation, or Threat

■ Conceding that Stern's complaint in all other particulars makes allegations sufficient to satisfy the literal language of § 1985(1), appellants nonetheless insist that the use of conspiratorial means of "force, intimidation, or threat" is a necessary element of any action under that section and that Stern has not adequately alleged that element. Stern argues, and the district court determined, both that his complaint is drawn under portions of § 1985(1) which do not include such a requirement, and that even if the requirement were to be imposed, his complaint sufficiently satisfies it to withstand a motion to dismiss. His complaint alleges, *inter alia,* a conspiracy to injure him in his person, property, and professional reputation on account of the lawful discharge of his official duties "by intimidation, threat or otherwise."

We begin our analysis of this issue by considering the statutory language. As we read § 1985(1), it opens by stating the requirement that "two or more persons . . conspire" and then proceeds, in four infinitive phrases, appropriately qualified and set off from each other with the disjunctive "or," to state the types of conspiracies covered. The section may thus be broken into component parts, as follows: [10]

If two or more persons in any State or Territory conspire

[1] *to prevent,* by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof;

[2] *or to induce* by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed,

[3] *or to injure* him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof,

[4] *or to injure* his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties[.]

Reading § 1985(1) in this natural manner, the limitations of the "force, intimidation, or threat" requirement are apparent. While the requirement is express in the first substantive phrase, and incorporated by the words "by like means" in the second, it does not modify the last two substantive phrases, under which, of course, Stern's complaint is primarily drawn.[11]

We agree with the parties that § 1985(1) is not a model of clear and precise draftsmanship, but we think that the reading we give the section effectuates a relatively plain Congressional intention. It gives the normal grammatical significance to the use of the disjunctive "or" by allowing each of the phrases thus set off to have independent effect. *See Flora v. United States,* 362 U.S. 145, 149–50, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). Nor does this interpretation disrupt an apparently integrated whole. The statute makes perfectly good sense without imposing a "force, intimidation, or

---

**10.** Phrase numbers and emphasis are supplied for clarification.

**11.** We note that the Fourth Circuit, applying the identical language of the criminal counterpart statute to § 1985(1) [18 U.S.C. § 372] in *United States v. Hall,* 342 F.2d 849 (4th Cir. 1965), *cert. denied,* 382 U.S. 812, 86 S.Ct. 28, 15 L.Ed.2d 60 read that statute just as we read § 1985(1). Setting out the statutory text pertinent to an indictment drawn under the last two

phrases of 18 U.S.C. § 372, the court omitted the "force, intimidation, or threat" language. *Id.* at 850 n. 1. Although the conduct at issue in *Hall* did in fact involve the use of force and the argument advanced by appellants here was not, apparently, made in *Hall,* the case nonetheless confirms our concept of the natural reading of the statutory language. In this regard, *see also* C. Antieu, Federal Civil Rights Acts, *supra* § 94, at 124.

threat" requirement on each of its parts. Congress could soundly have determined that the federal interest in the carrying out of federal functions would not be offended when, e. g., two or more persons act together to prevent another from accepting or holding a federal position by offering that person a better job. When, on the other hand, force, intimidation, or threat are used to achieve that end, the federal interest would be offended even if no legally cognizable injury is done to the prospective or incumbent federal official.[12] A conspiracy to injure an official's person or property on account of the discharge of his duties or to prevent him from doing so, however, interferes directly and substantially with the federal interest in the effective formulation and execution of federal policy and functions, regardless of whether force, intimidation, or threat are used.[13]

Appellants' allegedly contrary citations to the legislative history provide no direct support for the proposition they would have us adopt. Their numerous citations to passages of the Congressional debates describing some of the outrages occurring at that time do not advance analysis of § 1985(1), for none of the passages relate specifically to that portion of the bill under consideration. The Act of April 20, 1871, contained many provisions to deal with the crisis of the times, and those which became § 1985(1) were only a small although important part thereof. We do not believe general debate passages describing the crisis provide a sufficient gloss to overcome the natural and logical meaning of the language of § 1985(1). Appellants' reliance on statements of Representative Cook, who introduced the amendment which became Section 2 of the Act (which section included the language of § 1985(1)), is similarly misplaced. Representative Cook did expressly disavow an intent to fashion a federal law to enforce state criminal laws "except . . . when the State may be unable to do so by reason of lawless combinations too strong for the State authorities to suppress." Cong.Globe, 42d Cong., 1st Sess. 485 (1871). But this reference is of no value in interpreting § 1985(1); it merely explains the purpose of the amendment offered, which substantially changed Section 2 by eliminating language that went a long way towards establishing such a general federal role in enforcing state criminal laws. It was this eliminated language that "raised the greatest storm" in the debates. Monroe v. Pape, supra, 365 U.S. at 181, 81 S.Ct. 473. We fail to see how an explanation of the reasons for eliminating those provisions sheds light on the meaning of the distinctly different and relatively noncontroversial provisions which remained in Section 2.

This court's decision in Sarelas v. Anagnost, 332 F.2d 111 (7th Cir. 1964), emphasized by appellants, does not in any way suggest a different conclusion. It is true that the plaintiff there alleged a conspiracy to "intimidate," "injure," and "harass" him, that this court characterized plaintiff's complaint as alleging, at most, "some kind of defamation," and that no cause of action under either 42 U.S.C. §§ 1985(2) or 1985(3) was found to exist. Id. at 112–13. But the facts of Sarelas were totally dissimilar to those presented here, and the opinion's two sentence rejection of the §§ 1985(2) and 1985(3) theories was manifestly based on the clear failure of those facts to fall within

---

12. If only intimidation or threat were used, for example, it could well be that the official would not have suffered an assault, under the well-settled black letter rule that "mere words or threats . . . do not constitute an assault." 6A C.J.S. Assault & Battery § 6, at 323 (1975). Likewise, the elements of the comparatively recent tort of intentional infliction of emotional distress might or might not be present in such a case. Either way, the federal interest would seem to be offended.

13. Our conclusion that the language "force, intimidation, or threat" does not modify all of § 1985(1) is buttressed by the fact that the language makes a poor fit with the last two infinitive phrases of the section. It is difficult to imagine, e. g., how two or more persons might "conspire . . . by . . . intimidation, or threat . . . to injure [a federal official's] property," but the construction appellants urge for § 1985(1) would make that the scope of the last phrase, thus depriving it of any real meaning.

the ambit of those sections. Nothing in the opinion dealt with § 1985(1) or any arguable "force, intimidation, or threat" requirement, and the case surely does not stand for any proposition pertinent thereto. Moreover, we agree with Stern that to the degree appellants are arguing here that "mere" defamation cannot amount to a violation of § 1985(1), they are wrong. The relevant question is whether or not the complaint alleges the elements required by the language of that section, not whether such elements might also constitute a state law cause of action. With respect to the relevant question, Stern is, so far, on solid ground.[14]

### IV. The Relationship of Section 1985(1) to the Fourteenth Amendment

 Although there is nothing in the express language of § 1985(1) to support such an interpretation, appellants insist that Stern's complaint is insufficient because the section creates a remedy only for federal officers injured in the course of or on account of attempting to enforce the provisions of the Fourteenth Amendment to the Constitution. They direct our attention to the fact that federal officers so attempting in 1871 were often threatened, intimidated, or injured by those resisting Reconstruction, and they argue that § 1985(1) was enacted as part of an integrated statutory scheme to deal with such resistance. We disagree.

In addition to the absolute lack of any textual indications in § 1985(1) that such a limitation on its scope was intended, there are numerous positive indications to the contrary. The title of the Act of April 20, 1871, for example, was "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, *and for other Purposes.*" 17 Stat. 13 (emphasis supplied). President Grant's message to the Congress requesting the legislation gives an indication of what some of those "other Purposes" were. That mes-

sage began with these words: "A condition of affairs now exists in some States of the Union rendering life and property insecure *and the carrying of the mails and the collection of the revenue dangerous.*" Cong. Globe, 42d Cong., 1st Sess. 244 (1871) (emphasis supplied). The Congressional debates also contain numerous references to injuries inflicted on federal mail and revenue agents. *See, e. g., id.* at 247, 248. Such agents, of course, in the normal course of their duties perform federal functions unrelated to the enforcement of the Fourteenth Amendment. The evil Congress sought to remedy was not limited to injury inflicted on those enforcing that Amendment, and we see no reason to conclude the remedy enacted was less broad than the evil to which it was directed.

We find untenable any suggestion that the constitutional authority of Congress to enact § 1985(1) depended on such a nexus to the Fourteenth Amendment as appellants suggest. Protection of federal officials from force, intimidation, threat, or injury at the hands of those who would disrupt, obstruct, or prevent the formulation and execution of federal functions is but a necessary incident of sovereignty. It is akin to the inherent governmental "power of self-protection" which has been consistently recognized in other contexts, *see, e. g., United States v. Harriss,* 347 U.S. 612, 625–26, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *Burroughs and Cannon v. United States,* 290 U.S. 534, 545, 54 S.Ct. 287, 78 L.Ed. 484 (1934), and it advances the important federal interest in the effective operation of government. *See, e. g., United States Civil Service Commission v. National Association of Letter Carriers, AFL–CIO,* 413 U.S. 548, 564, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *United Public Workers of America (C.I.O.) v. Mitchell,* 330 U.S. 75, 99, 101, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Such legislation is manifestly sustainable under Congress' constitutional power "[t]o make all Laws which shall be necessary and proper for carrying into Execution [its specified] Powers, and

---

**14.** Our resolution of the "force, intimidation, or threat" issue makes it unnecessary for us to consider Stern's contention that his complaint adequately alleges conspiratorial means of intimidation or threat.

all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S.Const., Art. I, § 8. No recourse to the Fourteenth Amendment would be necessary.

Nor is there any indication that Congress conceived the matter otherwise. What we have designated above as the first infinitive phrase of § 1985(1) was, in virtually identical language, incorporated in a criminal statute enacted seven years before the adoption of the Fourteenth Amendment Act of July 31, 1861, ch. 33, 12 Stat. 284. This fact was pointed out by Representative Shellabarger, the Chairman of the House Select Committee which authored the Act of April 20, 1871, when he presented to the Congress the amended language which became, *inter alia,* § 1985(1). Cong.Globe, 42d Cong., 1st Sess. 478 (1871). Although the creation of a civil remedy and the specific provisions under which Stern's complaint is drawn were new with the 1871 Act, Representative Shellabarger stated his belief that these provisions were "clearly independent of the fourteenth amendment, referable to and sustainable by the old provisions of the Constitution . . . ." *Id.* We find no evidence that any member of Congress disagreed; none of the debates on the scope of power created by the Fourteenth Amendment make any reference to the provisions which became § 1985(1).

Our conclusion that § 1985(1) does not limit its protections to officers injured while attempting to enforce the Fourteenth Amendment is bolstered by the interpretation other courts have given the counterpart criminal statute, 18 U.S.C. § 372. Repeatedly, § 372 has been applied to conspiracies to injure, threaten, interfere with the work of, or intimidate federal officers who were performing duties unrelated to the enforcement of the Fourteenth Amendment. *See, e. g., Murphy v. United States,* 481 F.2d 57 (8th Cir. 1973) (occupation of a Bureau of Indian Affairs office prevented

the performance of duties of those who worked there); *United States v. Barber,* 442 F.2d 517 (3d Cir. 1971), *cert. denied sub nom. Robinson v. United States,* 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83 (FBI agents in process of arresting a deserter were assaulted to facilitate the deserter's escape); *United States v. Hall, supra* (conspiracy to arrest or injure IRS agent investigating the sale of untaxed liquor).

## V. Section 1985(1) and the "Invidiously Discriminatory Animus" Requirement of Section 1985(3)

Relying substantially on their view of the entire Act of April 20, 1871, as an integrated statutory scheme, appellants argue that § 1985(1) must be read to include the requirement that an actionable conspiracy must be motivated by an "invidiously discriminatory animus." This requirement is borrowed from the Supreme Court's treatment of 42 U.S.C. § 1985(3) in *Griffin v. Breckenridge, supra,* 403 U.S. at 102, 91 S.Ct. 1790. Section 1985(3) provides a remedy for injuries resulting from conspiracies

for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . .[15]

Taking this language at face value, and pointing to the Congressional amendment which eliminated provisions authorizing general federal enforcement of common law crimes, *see* discussion in part III, *supra,* the *Griffin* Court held that "[t]he language [of § 1985(3)] requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102, 91

---

15. Section 1985(3) also defines as actionable conspiracies to injure on account of or to prevent the exercise of the right to support or advocate the election of candidates for federal office, and includes the civil remedy provision for all of § 1985; the latter is set out *supra* at note 2.

S.Ct. at 1798 (emphasis in original) (footnote omitted). Appellants ask us to impose this requirement on § 1985(1). If we do so, we must reverse the district court, for Stern's complaint makes no allegations of any class-based discriminatory motivation underlying the conspiracy which injured him, nor can we conceive any likelihood that if amendment were permitted, such could be alleged.

The serious initial difficulty with appellants' argument is that it is without support in the language of § 1985(1). Unlike § 1985(3), § 1985(1) does not limit its scope to conspiracies aimed at the deprivation of equal protection or equal privileges and immunities. Moreover, the existence of such a limit in § 1985(3) is persuasive evidence that Congress knew how to impose it when it was intended. We do not believe *Griffin* controls this case. Indeed, to the substantial degree that that decision is based on express language of § 1985(3) which is not present in § 1985(1), it undercuts appellants' argument.

■■■■ We agree with appellants that it is proper to read the various provisions of a single Congressional enactment in conjunction with each other. But we reject the "corollary" appellants seem to be suggesting, that limitations expressed in one provision ought to control the rest. No doubt, the equal-protection—equal-privileges-and-immunities language of § 1985(3) was drafted with a view to the appropriate scope of Congressional power under the Thirteenth and Fourteenth Amendments. *See, e. g.,* Cong.Globe, 42d Cong., 1st Sess. 478 (1871) (remarks of Representative Shellabarger). For the reasons we have previously stated, however, no such constraints were applicable to § 1985(1) and its protections of federal officers in the performance of their duties, and there is no indication Congress intended unnecessarily to limit the reach of these protections..

Two considerations reinforce our decision to apply § 1985(1) as its language seems plainly to suggest rather than "construing" it to include a requirement of "invidiously discriminatory animus." First, to read § 1985(1) as appellants suggest would deprive that section of much or all of its independent effect. The invidious animus requirement of *Griffin* is simply the test the Supreme Court established for determining whether a claim adequately involves a conspiratorial "purpose of depriving . . . any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" as § 1985(3) requires. There can be no question that federal officials, no less than other persons, may in proper cases invoke the civil remedy for this § 1985(3) conspiracy. Because the only other element of a § 1985(3) cause of action is injury resulting from an overt act in furtherance of the conspiracy, an element common to a § 1985(1) cause, the effect of imposing the invidious animus requirement on § 1985(1) would be to require a plaintiff to plead and prove a complete § 1985(3) cause of action in his § 1985(1) lawsuit. We cannot believe Congress intended § 1985(1) to have such merely duplicative effect. *See Griffin, supra,* 403 U.S. at 99, 91 S.Ct. 1790.

The second reinforcing consideration to which we have adverted is that the counterpart criminal statute of § 1985(1) [18 U.S.C. § 372] has repeatedly been applied to circumstances in which no invidiously discriminatory animus was alleged or proved or even remotely inferable. *See, e. g., Murphy v. United States, supra; United States v. Barber, supra; United States v. Hall, supra.* We can see no reason for applying to the civil remedy a more restrictive rule of law than is applied in determining whether people may be criminally punished for offenses against the United States.

Perhaps because of the paucity of authority squarely on point, appellants and Stern suggest an analogy to 42 U.S.C. § 1985(2).[16]

---

**16.** Section 1985(2) provides:

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending

such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the

That section defines two broad classes of actionable conspiracies; the second of these includes language, similar to that of § 1985(3), requiring an intent to deprive a citizen of equal protection, or to injure a citizen for attempting to enforce equal protection, while the first contains no such language. Stern and the appellants[ seem to agree that the *Griffin* invidiously discriminatory animus requirement would apply to conspiracies defined in the second part of § 1985(2), and we may assume *arguendo* that this is so.[17] Judicial treatment of the first part, which lacks equal protection language, is, of course, more relevant here. Unfortunately, the sharpness of any such analogy is blunted by the fact that the parties each have one case to support their reference to this part of § 1985(2). *Kelly v. Foreman,* 384 F.Supp. 1352 (S.D.Tex.1974), cited by Stern, rejects application of the *Griffin* requirement to the first portion of § 1985(2), on plain language grounds essentially similar to those we have expressed here. *Jones v. United States,* 401 F.Supp. 168 (E.D.Ark.1975), *aff'd,* 536 F.2d 269 (8th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 735, 50 L.Ed.2d 750 reaches the opposite result.

The proper result in a § 1985(2) case, of course, is not before us, but the analogy having been urged, we find it necessary to indicate that we find the logic of *Jones* unpersuasive in the case at hand. First, the district court's opinion in *Jones* places substantial emphasis on the Congressional debate and amendment pertinent to Section 2 of the Act of April 20, 1871, with respect to the power of Congress to authorize federal prosecution of common law crimes. We have considered this question above. Whatever may be said about § 1985(2),[18] we have concluded that no nexus to the Thirteenth or Fourteenth Amendments was needed or perceived to be needed to sustain § 1985(1). Second, the *Jones* district court cited a number of cases for the proposition that the *Griffin* requirement applied to all of § 1985(2).[19] Recognizing that such cases would not be directly controlling here in any event, we note only that we do not read the cited cases that way. Notwithstanding occasional dicta therein, none of the cases so *held,* as each presented claims cognizable only under the second portion of § 1985(2). We realize that in the two sentences of its opinion addressed to the question, the Eighth Circuit in *Jones* affirmed the "holding" of the district court that "the racial or class-based discrimination rationale expressed . . . in *Griffin* . . . applies equally to all clauses of that statute." 536 F.2d at 271. Because the suit there presented was based, as pertinent here, only on § 1985(2) we believe this language may be read to refer only to the clauses of that provision,[20] even though the immediate con-

verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; of if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws[.]

The remedial provision of § 1985(3) applies to the conspiracies thus defined.

17. A number of courts have so held. *See, e. g., Hahn v. Sargent,* 388 F.Supp. 445 (D.Mass. 1975), *aff'd,* 523 F.2d 461 (1st Cir.), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976); *Kerckhoff v. Kerckhoff,* 369 F.Supp. 1165 (E.D.Mo.1974); *McIntosh v. Garofalo,* 367 F.Supp. 501 (W.D.Pa.1973); *Johnston v. National Broadcasting Company, Inc.,* 356 F.Supp. 904 (E.D.N.Y.1973); *Phillips v. Singletary,* 350 F.Supp. 297 (D.S.C.1972); *Boulware v. Battaglia,* 327 F.Supp. 368 (D.Del. 1971); *Kitchen v. Crawford,* 326 F.Supp. 1255 (N.D.Ga.1970), *aff'd,* 442 F.2d 1345 (5th Cir. 1971), *cert. denied,* 404 U.S. 956, 92 S.Ct. 318, 30 L.Ed.2d 272.

18. Arguably, at least, the first portion of § 1985(2) aims at protecting the sanctity of federal court proceedings and could be sustained without any reference to the Reconstruction Amendments.

19. The cases cited by the district court are all set out in note 18 *supra.*

20. As Chief Justice Marshall stated in *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821), "It is a maxim, not to be disregarded, that general expressions, in every opinion,

text seems to suggest that reference was had to *all* of § 1985. If the broader result was intended, however, we must respectfully decline to agree with the obiter dictum.

### VI. Section 1985(1) and the Right to Petition.

Any injuries to Stern from appellants' alleged conspiracy resulted from the overt acts of communicating or causing to be communicated complaints about Stern's performance of his official duties to his IRS superiors. We have previously expressed our agreement with appellants that the evils addressed by the Forty-Second Congress in enacting the Act of April 20, 1871, were of a meaningfully different nature, and that there is no indication any member of that Congress ever contemplated the application of what is now § 1985(1) to such facts as Stern's complaint alleges. We have rejected each of appellants' constructional arguments which were properly before us, however, because they would have distorted the meaning of § 1985(1) in all its applications in order to adhere more closely to that which the Forty-Second Congress was specifically addressing.

We have reserved until now the constitutional objections urged by appellants to the application of a § 1985(1) remedy to these facts, in accordance with the well-established rule that the federal courts "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Appellants' other grounds having proved non-dispositive, we must consider their constitutional argument. It is based on the First Amendment to the Constitution, which provides, in pertinent part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." Appellants assert that the communication of complaints about Stern's official conduct was a classic exercise of this right. Accordingly, they insist, this court should either construe § 1985(1) to avoid the constitutional problems that would result if it were applied here, or hold that § 1985(1) is unconstitutional as applied to these facts.

■ Appellants' argument raises serious and important questions. For the right to petition for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *United Mine Workers of America, District 12 v. Illinois State Bar Association*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). It shares the "preferred place" accorded in our system of government to the First Amendment freedoms, and has "a sanctity and a sanction not permitting dubious intrusions." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). Indeed, as the Supreme Court recognized in *United States v. Cruikshank*, 92 U.S. 542, 552, 23 L.Ed. 588 (1875), the right to petition is logically implicit in and fundamental to the very idea of a republican form of governance.

■ The public criticism of governmental policy and those responsible for government operations is at the very core of the constitutionally protected free speech area, *see, e. g., Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). We think it plain that presenting com-

---

are to be taken in connection with the case in which those expressions are used." Thus, *e. g.,* single sentences taken from the context of the opinions of this court in *Colaizzi v. Walker,* 542 F.2d 969, 972 (7th Cir. 1976), *cert. filed,* 45 U.S.L.W. 3437 (Dec. 9, 1976) (No. 785); and *Elmwood Properties, Inc. v. Conzelman,* 418 F.2d 1025, 1028 (7th Cir. 1969), *cert. denied,* 397 U.S. 1063, 90 S.Ct. 1498, 25 L.Ed.2d 684 (1970), might be read to suggest a necessary equal protection nexus or an invidiously discriminatory animus requirement for *all* of § 1985, even though both cases involved claims not even arguably actionable other than under § 1985(3). The mere failure in a single sentence to specify a statutory subsection under consideration surely creates no precedents, at least where the context supplies the specification.

plaints to responsible government officials about the conduct of their subordinates with whom the complainer has had official dealings is analogously central to the protections of the right to petition. It matters not that the subject of the grievance may not be political, in the sense of raising public policy issues, although we do not say that allegedly unprofessional conduct of IRS officials is not a matter of public interest. But even if it were not, First Amendment protections apply. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *United Mine Workers, supra,* 389 U.S. at 223, 88 S.Ct. 353; *Thomas v. Collins, supra,* 323 U.S. at 531, 65 S.Ct. 315. Indeed, the fact that a grievance may not arouse sufficient public concern to generate political support makes the individualized exercise of the right to petition all the more important. Unless the grievance embodies a violation of established and judicially enforceable state or federal right, individual petitioning may be the only available means of seeking redress.

■ Nor can it make a difference that the grievance is motivated by financial self-interest. So to hold would at once both deprive government of much of the public input upon which its representative nature vitally depends and "deprive the people of their right to petition in the very instances in which that right may be of the most importance to them." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139, 81 S.Ct. 523, 531, 5 L.Ed.2d 464 (1961). Likewise, we consider it irrelevant to the applicability of the right to petition that its exercise might have the effect of causing professional injury to the official about whom complaints are made, or even that the complainer may be aware of or pleased by the prospect of such injury. Whenever substantial charges of any credibility are made, a shadow of doubt, at least, may fall upon their object. This effect follows too naturally from its cause for its presence to vitiate the propriety of the use of First Amendment rights, if those rights are to retain meaning. The possibility that a citizen who feels himself to have been abused by a particular federal official may take satisfaction when the official gets his perceived due is too human for First Amendment protection to depend on its absence. *See id.* at 143–44, 81 S.Ct. 523.

Accordingly, we agree with appellants that the presentation of complaints about an auditing IRS agent's professional conduct to his superiors is a classic example of the right to petition.[21] A scurrilous anonymous letter or an attempt to marshal political clout to ruin an offending agent would certainly present different cases than does this open straightforward petition lodged through what the parties agree to be the proper and established channels. *See* 8 CCH 1977 Stand.Fed.Tax Rep. ¶¶ 5983 at 67,112, 67,114–15, 5985 at 67,146. Construction of § 1985(1) to apply a federal damage remedy to such facts would raise grave constitutional questions, because "laws which actually affect the exercise of these vital [First Amendment] rights" need not do so directly and overtly to be adjudged constitutionally offensive. *United Mine Workers, supra,* 389 U.S. at 222, 88 S.Ct. at 356; *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). And we have no doubt that the prospect of a federal lawsuit resulting from any citizen complaint about the conduct of federal officials could chill the exercise of the right to petition.

---

**21.** While the case before us is concerned with an IRS agent, we cannot be unmindful that some members of the public entertain the idea, irrespective of how poorly founded the idea might be, that complete cooperation with any governmental agent conducting an investigation is the best procedure for avoiding needlessly extended and searching probing. In *United States v. Lehman,* 468 F.2d 93, 97 (7th Cir. 1972), *cert. denied,* 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232, *e. g.,* the defendant dentist, although not successful in avoiding a prosecution, followed the advice of a professional journal that recommended the self-handling of interviews with IRS agents without the participation of auditors or attorneys. The attitude of complete cooperation would rather obviously preclude the making of an official complaint of misconduct except in the most egregious of circumstances.

We are not unmindful that a counter-argument could be advanced to the effect that the possibility of no federal statutory protection of a government agent in the circumstances alleged in Stern's complaint might very well chill entry into government service. Aside from the fact that we are unaware of any lack of applicants for non-policy governmental positions despite the lack of any such federal statutory protection heretofore, we note that when charges of misconduct are made through official channels, as was the case here, the protective machinery of due process hearings is available, with full opportunity to refute that which is unfounded.

If it were clear that Congress contemplated and chose an application of § 1985(1) that would create the consequences Stern seeks, we would be obliged to balance these considerations against the indisputable governmental power to protect federal officers against harassment and injury on account of the performance of their duties, *see* part IV *supra*, in order to determine whether the § 1985(1) remedy advanced compelling governmental interests in an appropriately narrow way. But we are not free lightly to impute to Congress an intention to invade the right to petition, *Noerr, supra*, 365 U.S. at 138, 81 S.Ct. 523; and as we have said, the legislative history lacks any specific indications of such an intention. It is basic to federal jurisprudence that courts must seek any reasonable construction of a statute that is consistent with its legislative purpose so as to avoid serious constitutional doubt. *Schneider v. Smith*, 390 U.S. 17, 26, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968); *United States v. Rumely*, 345 U.S. 41, 45–46, 73 S.Ct. 543, 97 L.Ed. 770 (1953); *Ashwander v. Tennessee Valley Authority, supra*, 297 U.S. at 348, 56 S.Ct. 466 (Brandeis, J., concurring), quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932). We honor that rule here by holding that a § 1985(1) complaint is insufficient to state an actionable federal claim insofar as it only alleges injury resulting from complaints about the plaintiff officer's official performance lodged by the defendants with the officer's superiors.

Because Stern's complaint alleges no more, the district court should have granted appellants' motion to dismiss it.

We realize of course, that § 1985(1), as we have construed it, literally could be applied here. To do so, however, would produce such problematic results that we decline to assume Congress, on a silent record and in response to very different circumstances, intended them. *Cf. Helvering v. Hammel*, 311 U.S. 504, 510–11, 61 S.Ct. 368, 85 L.Ed. 303 (1941); *United States v. Katz*, 271 U.S. 354, 357, 362, 46 S.Ct. 513, 70 L.Ed. 986 (1926). The Supreme Court's decision in *Noerr, supra*, while not on all fours with this case, provides a useful analogy. There the issue was whether the Sherman Act, 15 U.S.C. § 1 *et seq.*, could be applied in a private damage suit authorized by 15 U.S.C. § 15 to a concerted effort by numerous eastern railroads to obtain legislation and law enforcement harmful to truckers, who competed with the railroads. Conceding that the language of the Sherman Act could literally be applied to such conduct, 365 U.S. at 136, 81 S.Ct. 523, the Court nonetheless reasoned that such conduct was substantially dissimilar to the types of activities normally condemned by the Act. Finding that Sherman Act liability in such circumstances would raise important constitutional problems involving the right to petition, and seeing "no basis whatever" in the legislative history for concluding Congress intended to raise such questions, *id.* at 137, 81 S.Ct. 523, the Court held that the Act could not be applied. This mode of analysis seems to us appropriate here, and it leads, once followed, straight to the conclusion we have reached.

Although Stern does not argue the point, we are aware of the caveat in *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533, that the Sherman Act could be applied to "situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." The Court rejected such a conclusion there because the

railroads were patently making a "genuine effort" to influence government. *Id.* Likewise, no inference of a "mere sham" would be possible here, even if Stern were to amend his complaint to allege a "sham," for Stern's complaint makes it clear that the defendants genuinely sought governmental response to their charges, either by generating internal IRS pressure on Stern to act more professionally, or by having Stern removed from the USG audit. Just as in *Noerr*, the fact of defendants' success in obtaining what they sought further attests to the genuineness of the endeavor. Moreover, the possibility of inferring a "mere sham" here is even less than it was in *Noerr*; there, at least, direct if incidental injury to the plaintiffs' business relationships could well have resulted even if the defendants' publicity campaign had had absolutely no governmental impact. Here, in contrast, Stern's injuries resulted solely and directly from the defendants' charges' impact within the IRS. In this regard, we think it is significant that the defendants made their complaint to the very body concerned with whether a governmental employee was misusing the considerable power available to him. Compare this statement in *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission*, —— U.S. ——, ——, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 n. 10 (December 8, 1976): "It would strain First Amendment concepts extraordinarily to hold that dissident teachers could not communicate those views directly to the very decisionmaking body charged by law with making the choices raised by the contract renewal demands." We simply are not persuaded that Congress intended the language of § 1985(1) to curtail this type of redress-seeking under any circumstances.

Stern points out that his complaint alleges that appellants communicated or caused to be communicated their complaints with knowledge of their falsity. Relying on *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), Stern insists that knowing falsehoods do not enjoy constitutional protection. *See also Virginia State Board of Pharmacy, supra*, 425 U.S. at 771,

96 S.Ct. [1817] at 1830. We accept the formulation of this principle in the *Virginia State Board* case, that falsehood "has never been protected *for its own sake.*" *Id.* (emphasis supplied). But there is more involved here. It is easy enough to allege knowing falsity in a complaint and thus to avoid, if Stern is correct, a motion to dismiss. Summary judgment motions are particularly inappropriate vehicles by which to judge subjective considerations such as motive, intent, or knowledge. *See Staren v. American National Bank and Trust Company of Chicago*, 529 F.2d 1257, 1261–62 (7th Cir. 1976); *Conrad v. Delta Air Lines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974). Defendants in suits such as this one, then would in all likelihood be obliged to face full-blown litigation in which they must persuade a jury that their complaints, if not true, were at least based on enough facts as to avoid an inference of knowing or reckless falsity. This spectre alone could lead a citizen or taxpayer contemplating the lodging of a good faith complaint to reconsider.

We are sympathetic to the argument that Stern makes on this point, and we consider this to be a relatively close case for precisely that reason. We have no quarrel with the proposition that a state's interest in protecting its citizens from common law torts justifies overriding these First Amendment considerations when knowing falsity is alleged, and although expressing no opinion one way or the other we are not to be understood as implying that Stern's common law theories are unmeritorious. A similar overriding of the right to petition might likewise be sustainable in federal legislation which clearly and narrowly intended that effect. All that we decide today is that the real if peripheral chill of the right to petition which Stern's knowing falsity rule could engender is significant enough for the First Amendment values to play a part in construing federal legislation which is asserted to provide a separate remedy. And we think that the sounder path here, on this silent legislative record, is to conclude that Congress did not intend in any way to infringe a taxpayer's right to lodge through the proper channels

a complaint about the IRS agent in charge of auditing his tax account.

 No citation of authorities is needed for the proposition that the rights our founding fathers set down in the First Amendment are the subject of special protection by the courts. Those rights despite their theoretical strength as a constituent of democratic government have demonstrated remarkable fragility when exposed to the air of autocracy. While their protection should be the concern of all every year, it is particularly appropriate at the termination of the Bicentennial year of our nation to recall that the document which occasioned that celebration concluded its recital of grievances against a despotic ruler in these words:

> In every stage of these Oppressions we have Petitioned For Redress in the most humble Terms: Our repeated Petitions have been answered only by repeated Injury. A Prince, whose Character is thus marked by every act which may define a Tyrant, is unfit to be the Ruler of a free People.

> Because the count of Stern's complaint drawn under § 1985(1) states no actionable federal claim and no other basis for federal jurisdiction exists, the order of the district court is reversed and this case is remanded to the district court with direction to dismiss the complaint.

REVERSED AND REMANDED.

HASTINGS, Senior Circuit Judge. I respectfully dissent from the majority opinion.