282 S.E.2d 28 (1981)
Rick WEBB, Braxton Environmental Action Programs, Inc., and Mountain Stream Monitors,
v.
The Honorable William L. FURY, Judge, Upshur Circuit Court.
No. 14975.
Supreme Court of Appeals of West Virginia.
July 13, 1981.
Dissenting Opinion September 10, 1981.
*30 Robert M. Bastress, Jr., Charles R. DiSalvo, Gene R. Nichol, Jr., Morgantown, David Grubb, Charleston, for petitioners.
Steptoe & Johnson, Herbert G. Underwood, Irene M. Keeley, Clarksburg, Donald H. Vish, Lexington, Ky., for DLM Coal Corp.
Guy R. Bucci, Jennifer F. Bailey, Bucci & Ellis, Charleston, for West Virginia Trial Lawyers Ass'n, amicus curiae.
Norman L. Dean, Jr., Washington, D. C., for West Virginia Wildlife Federation and Nat. Wildlife Federation, amicus curiae.
M. Carolyn Cox, Mark L. Gerchick, Drake Cutini, Michael S. Helfer, William J. Kolasky, Jr., Wilmer & Pickering, Washington, D. C., for American Civil Liberties Union; Consumers Union of the United States, Inc.; League of Women Voters of the United States; Natural Resources Defense Council, Inc., amicus curiae.
L. Thomas Galloway, Washington, D. C., for Center for Law and Social Policy, amicus curiae.
Jerry Jackson, Sanford Sagalkin, Anthony C. Liotta, Jacques B. Gellin, Dept. of Justice, Washington, D. C., amicus curiae.
*29 McGRAW, Justice:
The petitioners, Rick Webb, Mountain Stream Monitors, and Braxton Environmental Action Programs, Inc., seek a writ of prohibition under the original jurisdiction of this Court to prevent the Circuit Court of Upshur County from proceeding with a defamation action filed in that court against the petitioners by DLM Coal Corporation *31 [DLM]. The petitioners do not contend that the circuit court lacked jurisdiction to deny the motion to dismiss. Rather they assert that a ruling of the circuit court which permits DLM to proceed with discovery and with the lawsuit below constitutes a substantial legal error in contravention of the constitutional mandate guaranteeing the rights of petition and of freedom of speech, and that prohibition will lie to restrain the enforcement of the ruling. After reviewing the outstanding briefs filed by both parties and by amici curiae, and after exhaustive research by the Court, we find merit in the defendant's constitutional arguments and, accordingly, award the writ as prayed for.
The facts of this proceeding are undisputed and simply distilled. DLM Coal Corporation is a West Virginia corporation engaged in the business of mining coal in Upshur County. Rick Webb is an individual living in Braxton County. Webb is the principal managing agent of Braxton Environmental Action Programs, Inc., a non-profit West Virginia corporation with the stated purpose of ensuring that coal development is conducted with full regard for creation and the rights of future generations. Webb is also an active, directing member of Mountain Stream Monitors, an unincorporated association concerned with the effects of coal mining on water quality.
On July 1, 1980, DLM filed an action in the Upshur County Circuit Court against Rick Webb, Mountain Stream Monitors, and Braxton Environmental Action Programs, Inc., charging them with libeling DLM and damaging its commercial interests through a series of communications the petitioners made to the Environmental Protection Agency and the Office of Surface Mining and through a newsletter published by Mountain Stream Monitors. The petitioners moved to dismiss the action under W.Va.R.Civ.P. 12(b)(6) for various technical grounds not addressed here, and for failure to state a claim upon which relief could be granted. They contend that these communications are constitutionally privileged. The trial court denied the motion to dismiss[1] and a motion to treat the issue on summary judgment. The lower court also refused to certify to this Court the questions raised by the motion to dismiss and ordered the parties to go forth with discovery. We granted a rule to show cause.
The alleged tortious communications with federal agencies consist of an administrative complaint lodged with the Office of Surface Mining [OSM], United States Department of the Interior, on September 13, 1979, and a request for an evidentiary hearing before the United States Environmental Protection Agency [EPA] dated October 12, 1979. According to DLM's complaint, these communications falsely asserted that DLM was in violation of the Surface Mining Control and Reclamation Act of 1977, 30 U.S. C.A. §§ 1201 et seq., and of the Clean Water Act, 33 U.S.C.A. §§ 1251 et seq., respectively.
Petitioner Webb filed a citizen's complaint against DLM under provisions of the Surface Mining Control and Reclamation Act which requires OSM to conduct an inspection whenever any person provides information which gives rise to a reasonable belief of a violation of the Act and entitles the person providing the information to accompany the federal inspectors on the inspection. 30 U.S.C.A. § 1252(e)(2). On September 24, 1979, Webb and two OSM inspectors met with DLM employees to test several seeps in the vicinity of DLM operations. Virtually all of the testings revealed that water leaving the general area of DLM operations contained either too much acid or iron under the limits established by federal *32 regulations.[2] However, the OSM inspectors could not conclusively establish that the water in the tested seeps contained surface run-off from areas mined by DLM. Although one seep definitely carried polluted water from an area worked by DLM, all of that area had been mined and regraded before May 3, 1978, the effective date of the federal regulatory program. As a result, OSM decided to take no enforcement action against DLM and informed Webb and DLM of the reasons for this decision. The petitioner chose not to exercise his statutory right to request administrative review of the decision.
At approximately the same time that OSM was investigating the administrative complaint, EPA had taken under consideration a DLM request to consolidate its various permits for water discharges from existing sources under the Clean Water Act. The Act establishes a program for issuing permits by EPA to individual point sources discharging various substances into the waters of the United States only "after opportunity for public hearing." 33 U.S. C.A. § 1342(a)(1). Pursuant to this provision, EPA has established a procedure for public participation in the permit-issuing process. Under the regulations, EPA issued a proposed permit to DLM on September 14, 1979, which would become effective on October 14, 1979, unless an adjudicatory (i. e., evidentiary) hearing was granted by the agency.[3] Petitioner Webb, acting for Braxton Environmental Action Program, Inc., received notice of the proposed permit on October 5, 1979, and by letter dated October 12, 1979, requested an evidentiary hearing. Although there is nothing in the complaint to indicate whether an evidentiary hearing was held, the permit became effective on October 14, 1979.
Under the Clean Water Act and EPA regulations, EPA is also required to impose more stringent effluent limitations on discharges from new sources. EPA considers, among other things, whether new seams will be mined, new drainage areas for discharges will be used, or new surface areas will be disturbed. 40 C.F.R. § 434.11(i) (1979). EPA concluded in March of 1980, that certain operations covered by the DLM permit might constitute new sources. As a result, EPA determined that the "existing source" permit granted DLM may have been inadequate and the agency invoked a procedure to withdraw portions of the permit.
Before the withdrawal became effective, DLM obtained a temporary restraining order in federal district court, prohibiting EPA from withdrawing or revoking any portion of the permit. A month later, EPA and DLM settled this action by stipulation in which EPA agreed to rescind its withdrawal notice. A copy of the stipulation, included as an appendix to one of the briefs filed here, reveals that DLM agreed not to mine possible new source areas until EPA could make a determination on the new source status of these areas. These facts, gleaned from DLM's complaint and exhibits and from the appropriate federal regulations, constitute the substance of the alleged defamatory communications with the federal agencies. DLM alleges that such communications were made maliciously, with knowledge of their falsity, in order to harass DLM and to damage its business relations.
DLM also alleged to be defamatory a four-page newsletter published by Mountain Stream Monitors which discusses the activities of the association and provides informational blurbs on such matter as the *33 allowable level of certain pollutants in streams, funding for the organization, and its educational activities. The first page of the newsletter, the only page incorporated into the complaint, contains an editorial, above which is a caption in bold face type: "Responsible Coal Development?" Also on that page is a map of the Buckhannon River watershed. The map contains shaded areas which represent surface mines in the watershed and identifies those mines by permit numbers. Two paragraphs appearing below the map read as follows:
At least forty miles of streams have fallen prey to acidification since 1971 in the MSM Project's Central West Virginia Target Area. Strip mining on the Buckhannon River Water-shed (mapped above) has destroyed over seven miles of native brook trout streams and jeopardized the entire river.
Coal mining, though previously limited in the unpolluted central West Virginia Headwater Region, is now expanding on a massive scale in response to rising energy demand. Ignorance, lack of concern, and the opportunity for fast profit will deal this area an ecological death blow if new levels of concern are not demonstrated in practice.
While DLM is nowhere identified in the newsletter, it is conceded by both sides that all the permit numbers shown on the map belong to DLM mines.
The newsletter and the communications with federal agencies constitute the sum of the alleged tortious communications. The petitioners assert that these activities are absolutely privileged petitioning activities under the First Amendment to the Constitution of the United States and, for that reason, the respondent may not maintain an action for damages against them in the circuit court. The right to petition the government embodied in the First Amendment to the United States Constitution is also protected by article III, section 16 of the Constitution of West Virginia, which provides that "[t]he right of the people ... to apply for redress of grievances shall be held inviolate."
The petitioners also advance several traditional defenses to defamation actions and ask that we consider them in prohibition. The petitioners would have us address the questions of whether the alleged defamatory statements are susceptible to being understood as referring to the respondent, whether the respondent can show actual malice, as the petitioners contend the respondent must, whether the respondent's allegations were made with sufficient particularity, and whether any allegations of the respondent are libelous per se.
The respondent contends that the communications made by the petitioners are defamatory and, thus, sees this case as a simple matter of a corporation trying to vindicate its reputation through the legal system. The respondent asks us to refuse the writ of prohibition on the ground that no absolute privileges apply in this case, and that the existence of any conditional privileges arising from the traditional defamation defenses asserted by the petitioners cannot be determined from the facts apparent on the face of the complaint. In short the respondent asserts that because the question of whether the petitioners' activities are conditionally privileged under traditional theories of the law of defamation cannot be determined without further factual development, prohibition does not lie to prevent the circuit court from proceeding with the litigation below, and the respondent is entitled to go forward with discovery and trial in order to vindicate its claim.
While the denial of a motion to dismiss is not usually an error for which prohibition will lie, prohibition will be used to examine the propriety of such a ruling when, as here, the ruling invades the unique constitutional guarantee of the right to petition the government for a redress of grievances contained in the First Amendment to the United States Constitution and article III, § 16 of the Constitution of West Virginia.
As was noted in Stern v. United States Gypsum Inc., 547 F.2d 1329 (7th Cir. 1977), cert. denied, 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467:

*34 [T]he right to petition for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." United Mine Workers of America, District 12 v. Illinois State Bar Association, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967). It shares the "preferred place" accorded in our system of government to the First Amendment freedoms, and "has a sanctity and a sanction not permitting dubious intrusions." Thomas v. Collins, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). Indeed, as the Supreme Court recognized in United States v. Cruikshank, 92 U.S. 542, 552, 23 L.Ed. 588 (1875), the right to petition is logically implicit in and fundamental to the very idea of a republican form of government.
547 F.2d at 1342.
Prohibition will lie to prohibit a case from proceeding to trial when the remedy of appeal is manifestly inadequate to protect against the chilling effect of allowing a suit to proceed because the complaint, as a matter of constitutional law, contains insufficient allegations to warrant an interference with a citizen's right to petition his government.
[I]n any case, whether antitrust or something else, where a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.
Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076, 1082-83 (9th Cir. 1976), cert. denied 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).
We agree with the respondent that it would be improper for us to discuss here the traditional defamation defenses raised by the petitioner. Those issues involve substantial factual issues which cannot be resolved without further development of the record. However, for the purpose of determining whether the communications of the petitioners are absolutely privileged under article III, § 16 of the state constitution and the First Amendment so as to bar a lawsuit based upon those activities, we need look only to the undisputed allegations contained in the complaint. If it appears that the petitioners' conduct falls within the class of absolutely privileged petitioning activity, the mere pendency of the action will threaten the petitioners' free exercise of their right to petition the government and the denial of the motion to dismiss by the circuit court will constitute error for which prohibition will lie.

I
The petitioners argue that the constitutional right to petition the government protects from subsequent legal action any communications intended to influence government action. In support of this contention, they cite the United States Supreme Court's opinions in Eastern Railroad President's Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). These cases form what is commonly referred to as the Noerr-Pennington doctrine. As this doctrine forms the foundation of the petitioner's right to petition argument, and as there are no constitutional law cases on point in this jurisdiction, an exposition of the doctrine is appropriate here.
In Noerr, a group of trucking companies and their trade association brought suit, primarily against a group of railroads, for violations of the Sherman Act. The plaintiffs charged the defendants with conducting a publicity campaign against the trucking industry in order to foster the "adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationship existing between the truckers and their customers". (footnotes omitted). Noerr, supra, 365 U.S. at 129, 81 S.Ct. at 525, 5 L.Ed.2d at 466. The district court in Noerr found that the railroad's *35 publicity campaign was malicious, fraudulent, and violative of the Sherman Act, and the Court of Appeals affirmed. The Supreme Court reversed, however, rejecting the plaintiff's contention that the Sherman Act prohibited the defendants from engaging in such activities, which the Court characterized as "mere group solicitation of governmental action". 365 U.S. at 139, 81 S.Ct. at 530, 5 L.Ed.2d at 472. The Court stated:
A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them.
365 U.S. at 139, 81 S.Ct. at 531-32, 5 L.Ed. at 472.
While it noted that the evidence showed that the publicity campaign "deliberately deceived the public and public officials", the Court ruled that the Sherman Act was not violated by "campaigns to influence legislation and law enforcement". 365 U.S. at 145, 81 S.Ct. at 533, 5 L.Ed.2d at 475.
In Pennington, supra, the Court took the opportunity to discuss the scope of Noerr. Pennington involved a suit brought against the United Mine Workers and certain coal companies alleging that the defendants had lobbied the Secretary of Labor to obtain adjustments to the Tennessee Valley Authority coal purchasing policy in order to drive small coal companies out of business. The Court held that "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose." 381 U.S. at 670, 85 S.Ct. at 1593, 14 L.Ed.2d at 636. The Court went on to hold that combinations intended to influence public officials are not violative of the Sherman Act even though the intended result of such influence is to destroy competition.
The clear import of the Noerr-Pennington doctrine is to immunize from legal action persons who attempt to induce the passage or enforcement of law or to solicit governmental action even though the result of such activities may indirectly cause injury to others. Such immunity is not limited to attempts to influence legislative and executive functions but extends as well to protect "the use of administrative or judicial processes...." Otter Tail Power Co. v. U.S., 410 U.S. 366, 380, 93 S.Ct. 1022, 1031, 35 L.Ed.2d 359, 369 (1973), rehearing denied, 411 U.S. 910, 93 S.Ct. 1523, 36 L.Ed.2d 201, on remand, 360 F.Supp. 451, aff'd. 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207.
Noerr left open the possibility that the political process may be so abused that efforts to influence the government are mere shams intended to cover anti-competitive activity. The Court stated that: [t]here may be situations in which a publicity campaign,... is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor...." 365 U.S. at 144, 81 S.Ct. at 533, 5 L.Ed.2d at 475. The sham exception was first confirmed by the Supreme Court in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The defendants there set up a trust fund to finance opposition to all applications the plaintiff would need to make to the agencies involved in regulating trucking, whether such opposition was without probable cause, and regardless of the merits. The defendants also told their competitors that they would cease this activity if the plaintiff withdrew pending applications. The Court held that the activity of the defendants was a "combination of entrepreneurs to harass and deter their competitors from having `free and unlimited access' to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities...." 404 U.S. at 515, 92 S.Ct. at 614, 30 L.Ed.2d at 649.
The parameters of the sham exception, as construed in California Motor, were well described by one scholar who noted that in California Motor "[t]he plan was not to *36 influence government, but rather to deter competitors from making applications that would set the public decision-making apparatus into motion. Such a scheme, if proven, would be embraced by the sham exception since ... it involved `nothing more than' a direct restraint on competitors". (Footnotes omitted). Handler, M. Twenty-Five Years of Antitrust (Twenty-Fifth Annual Antitrust Review), 73 Colum.L.Rev. 413, 436-37 (1973).
A pragmatic approach to the sham exception would permit legal action in situations where the direct petitioning activity corrupts the government process to such an extent that it constitutes access-barring conduct of the sort described in California Motor. For example, in Woods Exploration & Producing Co. v. Aluminum Company of America, 438 F.2d 1286 (5th Cir. 1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), the Fifth Circuit refused Noerr immunity to defendants who had filed false information before a regulatory agency. The court stated that it refused to extend the immunity because the incapability of the regulatory body to verify the information given it by the defendants so corrupted the decision-making process as to bar the plaintiffs from access to the regulatory process. See also, Israel v. Baxter Laboratories, 466 F.2d 272 (D.C.Cir.1972).
Although the Noerr-Pennington doctrine arose in the context of antitrust litigation, and most Noerr-Pennington applications involve antitrust suits, it is apparent that the foundation of the doctrine, and of the sham exception rests upon solid First Amendment grounds rather than upon a limited construction of the Sherman Act. As the Court stated in Noerr,
In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.
* * * * * *
The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.
365 U.S. at 137-38, 81 S.Ct. at 529-30, 5 L.Ed.2d at 471.
The doctrine has been applied in various cases not involving anti-trust litigation under the Sherman Act. For example, in Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607 (8th Cir. 1980), the court held that the attempts of individual property owners to prevent the construction of the plaintiffs' housing complex which "consisted of demanding a zoning amendment and participating in the spread of false and derogatory rumors about [plaintiffs'] proposed housing project", 626 F.2d at 615, were intended to induce governmental action and, thus, were absolutely privileged activities which constituted a bar to a civil rights action brought under 42 U.S.C.A. § 1983 under the First Amendment analysis of Noerr.
In Sierra Club v. Butz, 349 F.Supp. 934 (1972), the district court applied the Noerr-Pennington doctrine to a common law tortious business interference counter-claim brought by a lumber company against the Sierra Club and others which alleged that the counter-claim defendants had instituted administrative appeals and "other acts" with the intention of inducing the government to breach a contract it had to sell to the lumber company timber from a stand of trees near a "primitive" area. The court refused to apply traditional First Amendment conditional privileges such as actual malice because the activity in question was intended to influence government activity. The court stated:
For the reasons given in [Noerr], this Court is persuaded that all persons, regardless of motive, are guaranteed by the *37 First Amendment the right to seek to influence the government or its officials to adopt a new policy, and they cannot be required to compensate another for loss occasioned by a change in policy should they be successful.
349 F.Supp. at 938. See also, Stern v. United States Gypsum, Inc., supra (sending to government employee's superiors complaints that are known to be false); Sawmill Products, Inc. v. Town of Cicero, 477 F.Supp. 636 (N.D.Ill.1979) (protesting presence of plaintiff's sawmill which was then shutdown by town ordinance); Weiss v. Willow Tree Civic Ass'n, 467 F.Supp. 803 (S.D.N.Y.1979) (lobbying town officials en masse and filing groundless judicial and administrative complaints to oppose zoning permits); Aknin v. Phillips, 404 F.Supp. 1150 (S.D.N.Y.1975) (urging officials to enforce unconstitutionally vague ordinance against plaintiff's discotheque); People v. Gottfried, 64 Misc.2d 305, 314 N.Y.S.2d 725 (N.Y.Crim.1970) (where the doctrine immunized the defendant against criminal charges brought by the State).
Clearly, the Noerr-Pennington doctrine is a principle of constitutional law which bars litigation arising from injuries received as a consequence of First Amendment petitioning activity, regardless of the underlying cause of action asserted by the plaintiffs. The constitutional foundation of the doctrine also is the basis for the sham exception which is founded on the premise that it is just as constitutionally impermissible to deny citizens access to the judicial, legislative, or executive policy making functions on the pretext of soliciting policy changes from public officials as it is to premise liability on legitimate, albeit ill-motivated, attempts to influence government. We find this reasoning persuasive in our reading of article III, section 16.[4]

II
The communications made by petitioner Webb to the federal agencies appear to be classic examples of absolutely privileged petitioning activity. His communication to OSM, the agency charged with enforcement of the Surface Mining and Reclamation Act, requested an inspection of DLM's mining operations to determine whether the corporation had complied with provisions of that statute. He also requested that he be permitted to accompany the OSM investigators on their inspection of DLM's premises, as provided by statute. Webb's correspondence with EPA, the agency charged with enforcing and licensing the discharge of materials into water courses under the Clean Water Act, merely requested an adjudicatory hearing, i. e., an opportunity to present evidence, to reconsider EPA's decision to grant DLM a water pollution control permit and further investigation to determine whether the corporation was in compliance with the requirements of the statute. These communications appear to be exactly the types of activity that the right to petition was intended to foster and on all fours with the conduct held to be protected in Noerr and its progeny. In fact, the activity of which the respondent complains is actually encouraged under the citizen participation provisions *38 of the Surface Mining Control and Reclamation Act and provisions of the Clear Water Act.[5] The people's right to petition the government for a redress of grievances *39 is a clear constitutional right and the exercise of that right does not give rise to a cause of action for damages.
The respondent contends, however, that the petitioners' activity falls within the sham exception formalized in California Motor Transportation, supra, in that the petitioners' requests for administrative investigations were initiated "for the purpose of harassing the [respondent], interfering with [respondent's] relations with the governmental regulatory authority, and furthering [petitioners'] private motives rather than the public interest" and "to harass, intimidate and interfere with and destroy [respondent's] business." As we noted earlier, the essence of the sham exception is that the defendant's activity must be undertaken with a design to thwart the plaintiff's input into the political process. Handler, supra. Conduct which prevents a party from participating in the policy-making functions of the executive, legislative, or judicial branches of government is not petitioning activity protected by the right to petition the government, and such conduct may give rise to a cause of action for damages.
The respondent does not allege in its complaint that it was in fact denied access to or prevented from participating in the procedures of the federal agencies by reason of the petitioners' activities. Indeed the facts alleged in the complaint indicate that the respondent had ample opportunity to participate in the investigations launched by OSM and EPA. The investigation by OSM was conducted lawfully. DLM employees were present when the OSM inspectors tested the seeps in the area of DLM mining operation, and the investigation did not result in any citation or other adverse agency action against DLM. The EPA's attempted revocation of DLM's water pollution control permit was initiated by the agency itself pursuant to federal regulations and was ultimately withdrawn after the respondent resorted to proceedings in the federal district court.
Nor does the respondent allege specific facts in its complaint which would indicate an intent on the part of the petitioners to bar the respondent's access to the administrative process or to the courts and, thus, bring the petitioners' communications with the federal agencies within the sham exception. The sham exception connotes "misuse or corruption of the legal process. Therefore, the utilization of the court or administrative agency in a manner which is in accordance with the spirit of the law continues to be exempt...." Semke v. Enid Automobile Dealers Association, 456 F.2d 1361, 1366 (10th Cir. 1972). As we have already noted, the petitioners' correspondence with OSM and EPA was not only authorized by statute and regulation, but was in fact encouraged by the government. There is no allegation here, as there was in California Motor, supra, that the petitioners offered to cease their petitioning activity in return for some quid pro quo on the part of DLM, or that the petitioners were perverting the administrative process by systematically opposing all DLM permit applications regardless of their merit. Indeed it should be noted that both federal agencies found some substance to the petitioners' complaints about DLM's operations.
Nor does it appear that the petitioners attempted to instigate agency action in any way other than through "proper and established channels." As the court in Stern v. United States Gypsum, Inc., 547 F.2d 1329 (7th Cir. 1977), noted in the context of complaints made to the Internal Revenue Service about one of its agents:
A scurrilous anonymous letter or an attempt to marshal political clout to ruin an offending agent would certainly present different cases than does this open straightforward petition lodged through what the parties agree to be the proper and established channels.
547 F.2d at 1343.
The petitioners in the instant case made their comments directly to EPA and OSM, the very entities charged with regulating and licensing DLM's activities, and attempted to do so in the manner prescribed by statute and agency regulations. The respondent does allege in its complaint that *40 EPA, upon information supplied to it by the petitioners, initiated an illegal and arbitrary attempt to revoke DLM's water pollution control permit. There is no allegation, however, that the petitioners used political or economic influence to encourage the agency to proceed in an illegal manner or that the petitioners used any means other than openly supplying information directly to the agency in an effort to prompt revocation of the permit. The failure of EPA to proceed against the respondent in a lawful manner, if that is the case, has not been directly attributed by the respondent to the petitioners' efforts to induce agency action and is, therefore, not germane to the question of whether the petitioner's activities fall within the sham exception to the Noerr-Pennington doctrine.
The respondent's attempt to fit the petitioners' communications with federal agencies within the sham exception is heavily predicated upon its allegations that the statements made by the petitioners were false and malicious. The respondent asserts that proof of these allegations is sufficient to overcome the immunity conferred by Noerr-Pennington and that prohibition should not lie to preclude it from proceeding with its lawsuit below. A review of the cases dealing with this issue reveals that the majority of courts discussing the sham exception from this perspective have held that the right to petition protects activity alleged to be malicious or knowingly false. These decisions rely on the language of Noerr itself.
In Noerr the plaintiffs alleged and the district court found that the railroad's publicity campaign was "malicious and fraudulent  malicious in that its only purpose was to destroy the truckers as competitors, and fraudulent in that it was predicated upon the deceiving of [law enforcement] authorities...." 365 U.S. at 133, 81 S.Ct. at 527, 5 L.Ed.2d at 468. The Supreme Court accepted the lower court's characterization of the facts but held them to be irrelevant. The substance of the Court's position was that an allegation that a particular petitioning activity is malicious will not give rise to a cause of action for damages because "[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so". 365 U.S. at 139, 81 S.Ct. at 530, 5 L.Ed.2d at 472. The Court added that "[t]o hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns." 365 U.S. at 143-44, 81 S.Ct. at 533, 5 L.Ed.2d at 474-75.
A number of federal court cases have likewise held that even proof of malicious intent or knowing falsity would not defeat the First Amendment right to petition. Those cases make it clear that permitting proof of malicious, fraudulent or deceitful intention to overcome the right to petition would so discourage the exercise of the right as to constitute an impermissible burden. As Judge Zirpoli reasoned in Sierra Club v. Butz, supra:
[T]he malice standard invites intimidation of all who seek redress from the government; malice is easy to allege under modern pleading rules ... and therefore in most cases even those who acted without malice would be put to the burden and expense of defending a lawsuit. Thus, the malice standard does not supply the `breathing space' that First Amendment freedoms need to survive.
349 F.Supp. at 938.
In Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076 (9th Cir. 1976), cert. denied, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977). The court ruled that the sham exception has no application to direct lobbying efforts and was limited only to situations where the defendant is not seeking official action by a government body. 542 F.2d at 1080.
The only case to which we have been directed which applied the malice standard to the sham exception is Arlington Heights National Bank v. Arlington Heights Federal Savings and Loan Association, 37 Ill.2d 546, 229 N.E.2d 514 (1967), where the Illinois *41 court held that a citizen's right to petition a legislative body may give rise to civil liability if motivated by "actual malice". We are not impressed with the analysis of that case or with the authority cited therein. The court there cites Noerr for the proposition that intent is not germane in petition cases, yet goes on to apply a malice standard.[6] Such a holding, we think, flies in the face of Noerr's pronouncement that intent is irrelevant in petition cases. Accordingly, we decline today to adopt a malice standard for invoking the sham exception under our federal and state constitutional provisions.

III
The second phase of our inquiry is whether the statements made in the newsletter published by petitioner Mountain Stream Monitors are also protected under the principles of Noerr-Pennington. The respondent argues that since the newsletter did not involve direct petitioning activity, it is not governed by the doctrine. We disagree, relying principally upon the facts of Noerr itself for our support.
In Noerr the defendant had not provided any direct communication to the government. The subject of the suit was a massive publicity campaign, conducted mostly by a publicity firm, directed at arousing public hostility against the plaintiff. The Supreme Court concurred in the trial court's finding that the public communications were malicious and fraudulent, but nevertheless concluded that the communications were shielded by the right to petition because they arose in the context of a public campaign designed to "influence the passage and enforcement of laws," 365 U.S. at 142, 81 S.Ct. at 532, 5 L.Ed.2d at 474. The shielded information included "[c]irculars, speeches, newspaper articles, editorials, magazine articles, [and] memoranda", since they all "discuss in one way or another" charges of current violations and proposals for reform. 365 U.S. at 142-43, 81 S.Ct. at 532, 5 L.Ed.2d at 474.
Noerr-Pennington immunity has been applied by other courts which faced the question of whether to apply the doctrine to communications addressed to the public. In Mark Aero, Inc. v. Trans World Airlines, Inc., 580 F.2d 288 (8th Cir. 1978), the plaintiff, a commuter airline, alleged that certain scheduled air carriers had undertaken a publicity campaign intended to prevent the plaintiff from having free access to the city authority charged with ruling on the plaintiff's application for airport space. The court, ruling on an interlocutory appeal from a lower court's refusal to grant a motion to dismiss, stated:

*42 In the case before us it is alleged that the defendants have engaged in a publicity campaign involving the media and various citizens groups, that they have induced the Aviation Department of the City to refuse to make application to the FAA for approval of a master security plan, that they have made and induced others to make false and misleading statements to, and used "economic coercion" on, the City Council. These actions may all be admitted, and we take them as true, but what is being complained about is genuine political activity, protected by the first amendment rights of free speech and freedom of petition. (Footnote omitted).
580 F.2d at 297.
The court remanded the case with directions to dismiss the complaint.
In Missouri v. National Organization For Women, 620 F.2d 1301 (8th Cir. 1980), an antitrust action brought by the State of Missouri against NOW for engaging in a campaign which urged a public economic boycott of states which failed to ratify the Equal Rights Amendment, the court discussed the Supreme Court's holding in Noerr pertaining to third party publicity techniques and noted that the technique was used in Noerr to create a public demand for legislation. In considering NOW's use of a boycott, which the court observed to be as destructive or more so than third party publicity campaigns, the court stated: "[the] crux of the issue is that NOW was politically motivated to use a boycott to influence ratification of the ERA. In our case, as in Noerr, the publicity campaign was not a mere sham to cover up an attempt to interfere with the business relationship of a competitor." (Citations omitted). 620 F.2d at 1314.
In Franchise Realty, supra, the plaintiffs, subsidiaries of a fast food chain which was seeking building permits, alleged that the defendants had maliciously sought to deprive the plaintiff of meaningful access to the city board charged with issuing such permits. The activities alleged to be in violation of the Sherman Act included secretly soliciting people to appear before the board while not informing the board that they were appearing on the defendant's behalf, disseminating malicious and false statements through the news media designed to arouse public wrath against the plaintiff, and illegal picketing of the plaintiff's restaurants. The court held that these allegations were insufficient to overcome a motion to dismiss. The Court noted that the allegations in the complaint were totally conclusory and stated nothing specific enough to warrant interference with activity "which is prima facie protected by the First Amendment." 542 F.2d at 1083.
From this review it is evident that the right to petition includes, among other things, activity designed to influence public sentiment concerning the passage and enforcement of laws as well as appeals for redress made directly to the government. "[A] publicity campaign to influence governmental action falls clearly into the category of political activity." Noerr, supra, 365 U.S. at 140-141, 81 S.Ct. at 531, 5 L.Ed.2d at 473.
It seems clear to us that the statements published by the petitioners come within the immunity conferred under Noerr-Pennington. The portions of the newsletter which are reproduced in the respondent's complaint indicate an exhortation to the public to demonstrate concern for rapidly expanding surface mining and the resulting pollution of the area's waters. It is apparent to us that the newsletter here should be viewed in the context of a public campaign to "influence the passage and enforcement of laws." Because we find the malice standard inappropriate in petition cases under article III, § 16 of our constitution, allegations that the newsletter was maliciously published add nothing to the complaint and do not bring it within the sham exception to the Noerr-Pennington doctrine. When we repair to the traditional access-barring standard for invocation of the sham exception, it is obvious that the newsletter comes within the third party publicity technique rule laid down in Noerr. It certainly did not operate to deny the respondent access *43 to government agencies and, on its face, is far less noxious than any of the "big lies" which the court dealt with in Noerr. Moreover, the complaint contains no specific factual allegations which would warrant interference with the petitioners' constitutional rights. See footnote six, supra. For these reasons, we conclude that the statements published in the newsletter are absolutely privileged communications under the First Amendment and article III, section 16 of our state constitution.
In summary, our exposition of the Noerr-Pennington doctrine and its application to the facts of this case leads us to conclude that the petitioners' activities involve the exercise of the right to petition, a clear right under the First Amendment to the United States Constitution and article III, § 16 of the West Virginia Constitution. The direct communications with federal agencies contain none of the elements which would invoke the access-barring standard of the sham exception. Rather, it appears from the complaint that everyone had his say in this matter pertaining to government control of surface mining in the Buckhannon River watershed. The newsletter, too, is protected by the Noerr-Pennington doctrine. As our review illustrates, publicity campaigns intended to influence public sentiment on matters pertaining to the enforcement and passage of laws are shielded from liability. Moreover, the newsletter is protected by the guarantee of freedom of speech contained in article III, § 7 of the state constitution. Accordingly, prohibition will lie to protect the exercise of these essential constitutional rights. We therefore award the writ as prayed for.
As a final note, we shudder to think of the chill our ruling would have on the exercise of the freedom of speech and the right to petition were we to allow this lawsuit to proceed. The cost to society in terms of the threat to our liberty and freedom is beyond calculation. This cost would be especially high were we to prohibit the free exchange of ideas on such pressing social matters as surface mining. Surface mining, and energy development generally, are matters of great public concern. Competing social and economic interests are at stake. To prohibit robust debate on these questions would deprive society of the benefit of its collective thinking and, in the process, destroy the free exchange of ideas which is the adhesive of our democracy. Our democratic system is designed to do the will of the people, and when the people cannot express their will, the system fails. It is exactly this type of debate which our federal and state constitutions protect; debate intended to increase our knowledge, to illustrate our differences, and to harmonize those differences in order to form a more perfect union. We see this dispute between the parties as a vigorous exchange of ideas which is more properly within the political arena than in the courthouse. To hold otherwise would be to isolate ourselves in ignorance and to deprive society of the collective genius upon which our civilization depends. This we must never allow.
For the reasons stated in this opinion, the writ of prohibition as prayed for is awarded.
Writ awarded.
NEELY, Justice, dissenting:
The majority opinion in this case is essentially well reasoned and written; it appears at first blush eminently sensible, but I feel I must dissent because it overstates the rule of the Noerr-Pennington doctrine and fails adequately to explore appropriate procedures for cases of this sort. The majority appears to establish blanket immunity for false publications, even if published with the knowledge that the statements are false, and blanket immunity for tortious interference with business activity so long as this interference masquerades as an act of petitioning the government. At the same time I am not satisfied with the posture of the respondent in this case, DLM Coal Company, that a mere allegation of knowing, willful falsehood is sufficient to precipitate a disastrously expensive law suit in all its terror. Hence my concern becomes one of how to fashion appropriate *44 procedures that will address the overall equities of the situation.

I
Noerr held that the right to engage in political activity cannot be curtailed simply because one has a financial interest in the outcome of the political controversy involved, see Eastern R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127, 139, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961). It also held that the use of deception is not itself a violation of the Sherman Act, id. at 140-42, 81 S.Ct. at 531-532. U.M.W. v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), reiterated that an anti-competitive purpose lying behind attempts to influence the government does not make such attempts illegal. Further, it established that Noerr privileges extend to attempts to influence government activity of all types, not just "political" questions before the legislature. Finally, Pennington applied the doctrine that no damages may be collected from a private person when those damages resulted from government action. Id. at 669-72, 85 S.Ct. at 1593-1594.
The doctrine developed by these two cases does not create a blanket immunity for all activities that look like petitioning activities. Noerr itself postulated what has become known as the "sham" exception, contemplating occasions where the petitioning activities are "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Eastern R.R. Presidents Conference v. Noerr Motor Freight, supra 365 U.S. at 144, 81 S.Ct. at 533. The United States Supreme Court has approved the application of this qualification to immunity in at least two cases. In California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) the Court talks about petitioning activity "which leads the fact finder to conclude that the administrative and judicial processes have been abused," id. at 513, 92 S.Ct. at 613. Abuse was evident there where the consequence of the defendants' "petitioning" activity tended to "deprive the competitors of meaningful access to the agencies and courts," id. at 512, 92 S.Ct. at 612.
The logic of Noerr and Pennington does not suggest that only access-barring activity falls outside of Noerr-Pennington immunity. When Pennington stated that "Noerr shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose," U.M.W. v. Pennington, 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965), it was referring to anti-competitive purpose and intent. It did not mean to confer immunity on people who appear to be petitioning the government but who in fact have no intention to influence government or to vindicate rights reasonably asserted. See California Motor Transport v. Trucking Unlimited, 404 U.S. 508, 511-12, 92 S.Ct. 609, 612-613, 30 L.Ed.2d 642 (1972). When putative petitioners know for a certainty that there is no basis to their claim, there is no pure petitioning taking place. This becomes abundantly clear from the findings and holding in United States v. Otter Tail Power Co., 331 F.Supp. 54 (D.Minn.1971) remanded with instructions, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), 360 F.Supp. 451 (D.Minn.1973), aff'd, 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974). At trial, the court found the following facts which are particularly pertinent to the case at bar:
The efforts of Elbow Lake, Hankinson, Aurora and Colman, South Dakota, to establish municipal power systems were opposed by the defendant in court proceedings. Otter Tail either instituted or sponsored and financially supported court litigation which had the effect of frustrating the sale of revenue bonds to finance the municipal systems. A "no-litigation certificate," reflecting the absence of litigation which might impair the salability of revenue bonds, is essential to a successful sale of municipal bonds. The pendency of litigation has the effect of preventing the marketing of the necessary bonds thus preventing the establishment of a municipal system.

*45 Most of the litigation sponsored by the defendant was carried to the highest available appellate court and although all of it was unsuccessful on the merits, the institution and maintenance of it had the effect of halting, or appreciably slowing, efforts for municipal ownership. The delay thus occasioned and the large financial burden imposed on the towns' limited treasury dampened local enthusiasm for public ownership.
331 F.Supp. at 61-2 [footnotes omitted]. The court concluded that Otter Tail's litigation efforts were not immune from anti-trust liability because they were not undertaken to "redress claimed wrongs" but rather to frustrate a competitor. Id. at 62. The Supreme Court remanded the case for reconsideration in light of the California Motor decision, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), and upon remand the District Court again found that the defendant was not immune because "the repetitive use of litigation by Otter Tail was timed and designed principally to prevent the establishment of municipal electric systems and thereby to preserve defendant's monopoly," 360 F.Supp. 451 (D.Minn.1973). That conclusion was affirmed by the Supreme Court, at 417 U.S. 901, 94 S.Ct. 2594, 41 L.Ed.2d 207 (1974).
The allegations in the complaint in the case at bar are quite like the conclusions of the district court in Otter Tail. The plaintiff alleges that the communications with the various federal agencies by the defendants were calculated to harass the plaintiff and interfere in its business and not to vindicate perceived rights under the law. In addition, plaintiff here was unable to get a "clean bill of health" from its independent auditors because there were complaints pending against it, just as the towns in Otter Tail could not get "no-litigation certificates," and so in both cases sales of stock and bonds, respectively, were hindered. Finally, plaintiff contends that the communications with the government as well as the newsletter were false and that defendants knew that the material they wrote was false or were reckless as to the truth at the time of writing. The question for us is whether they may have some legal relief if all this is true.

II
The majority answers this question in the negative. They reject there being any significance in plaintiff's allegations of knowing falsehood by citing Noerr, which admittedly involved deceit. But the deceit there was that the defendants had third parties make statements to the government on behalf of the defendants which appeared to be spontaneous statements of the third parties. The deceit there had nothing to do with the truth or falsity of the statements involved. The majority also argues that if allegations of malice could suffice to overcome a defense of first amendment privileges it would deter people from exercising important rights even in a legitimate fashion. This is a substantial problem but in other circumstances a malice standard has been held to protect adequately first amendment interests, see Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, and I think that it should suffice here if proper procedural safeguards are devised, as I shall argue later. I would only add at this point that the only case of which I am aware from West Virginia on this point supports this conclusion: "But the privilege thus allowed [by the rights to assembly and petition] is not an absolute one as contended by ... the defendant. It raises a presumption of good faith and lack of malice in the representations made, in consequence of which express malice must be established by allegation and proof, to warrant recovery." Hancock v. Mitchell, 83 W.Va. 156, 159, 98 S.E. 65 (1919), and see The Quagmire Thickens: A Post-California Motor View of the Antitrust and Constitutional Ramifications of Petitioning the Government, 42 U.Cin.L.Rev. 281, 286 (1973) [hereinafter Quagmire].
At the same time the majority reads the so-called sham exception too narrowly. They argue that the plaintiff neither alleges nor adduces facts which tend to show that it was in fact denied access to the administrative procedures or that such was *46 the defendants' intent. They note that the pleadings show no irregularities in the procedures followed by the defendants or by the government agencies, and that, unlike California Motor, supra the defendants did not systematically oppose all DLM permit applications regardless of merit. But this misses the point of the sham exception. The majority says that "[c]onduct which prevents a party from participating in policymaking functions of the executive, legislative, or judicial branches of government is not petitioning activity protected by the right to petition the government, and such conduct may give rise to a cause of action for damages."
Their mistake is that the sham exception really uncovers from immunity any course of conduct which in fact is not petitioning activity, despite its appearance. Hence plaintiff's allegations of knowing falsehood and intent to harass become very important and relevant. If plaintiff's allegations can be substantiated they tend to prove that the defendants were not engaged in petitioning activity. If they knew that their statements to the federal agencies were not true, then they could not have been petitioning the government to "redress claimed wrongs." And if they were not petitioning the government, then they are not entitled to immunity.

III
So I would answer the question posed earlier in the affirmative: If the plaintiff can prove its allegations it may have legal relief. But as the majority eloquently argues there are substantial constitutional rights at stake and we dare not fashion a remedy for plaintiffs like DLM that would trample first amendment rights and privileges and/or impose risks on or disincentives to those who would genuinely and legitimately exercise those rights and privileges. How then can we protect both sides in controversies of this type?
In the area of speech an allegation that false material was published which at the time of publication was known to be false and which was deliberately published with the intent to injure through false publication has always sustained a cause of action for libel, even by a public official, see Sprouse v. Clay Communication, W.Va., 211 S.E.2d 674 (1975) cert. denied, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975). I would agree with the majority that this model is not entirely satisfactory in cases such as the one at bar, however. It is not overly difficult to plead malice even though it may be hard to prove it. In cases such as Sprouse where there is an individual plaintiff and a corporate defendant, the defendants are almost always better financed than the plaintiffs. While there is a certain amount of unfairness in forcing them to go through discovery merely on the allegation of malice, they generally can afford whatever expense that may entail and the cost of the process is not generally so high as to be punitive in itself and a disincentive to pioneering or crusading journalism.
But in the case before us we have ordinary citizens who are being sued by a well financed corporation for activities which appear to be not only constitutionally privileged but statutorily solicited and welcomed. While the plaintiff here in effect can spend unlimited amounts on superb legal talent, defendants in this and similar cases will be hard pressed to hire counsel at all. The potential for chilling legitimate first amendment rights when there is anything less than absolute immunity is awe inspiring.
The key to solving this dilemma is finding a device which will screen legitimate first amendment activity from irresponsible or sham first amendment activity. The majority has accomplished this in effect through its interpretation of California Motor. The majority would require an allegation that the plaintiff was denied access to government agencies and they imply that it is necessary for the plaintiff to allege that there has been a pattern of baseless litigation by the defendants. See, too, Quagmire, supra, at 315-16. The pattern of baseless litigation is the screening device which gives defendants protection against suits based on mere allegations of "malice" or "sham."

*47 IV
I propose a screening device which is more sensitive to the facts of a case as they really are and not just to the facts as they appear based on notice pleadings. I realize that this device is a significant departure from ordinary procedures, but this need not deter us from implementing it. First amendment law is in large measure a departure from ordinary principles. For example, the requirement that a public figure plead and prove malice to recover in libel is a judge-made rule designed to preserve the robust exchange of ideas and information which is essential to our way of life. We need not be shy of creating other rules which serve the same purpose, particularly if those rules also accommodate other societal interests, such as the right to recover damages from a tort-feasor in courts and not on the streets.
The procedure I propose involves three stages. First, I would adopt the statement of the majority in Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board of Culinary Workers, 542 F.2d 1076, 1082-83 (9th Cir. 1976): "[W]here a plaintiff seeks damages or injunctive relief, or both, for conduct which is a prima facie protected by the first amendment, the danger that the mere pendency of the action will chill the exercise of first amendment rights requires more specific allegations than would otherwise be required." Granted this entails a first amendment gloss on our Rules of Civil Procedure which generally require only notice pleading. However, if parties are aware that facts must be pleaded in such situations then this requirement should work no special hardship. If necessary, the Court should invoke its rule-making authority and amend the Rules to so provide. As an aside, the plaintiff in this case probably pleaded enough facts to get past this stage and for that reason I would not have granted the writ of prohibition.
Second, I would require that a preliminary hearing of sorts be held early in the proceedings in which the trial judge will decide whether the plaintiff has shown enough facts to proceed with the case. As we recently held, "whenever there is a first amendment defense to actions under state law the state court is required to be a judge of both the facts and the law," Mauck v. City of Martinsburg, W.Va., 280 S.E.2d 216, 220 (1981). The court must determine that the suit is brought in good faith and is supported by reasonable cause to believe that intentional, false material was communicated to the public or a governmental agency. Since to get to this point may often require some discovery and the costs of discovery and attendant legal fees themselves may chill the free exercise of first amendment rights, in appropriate circumstances of gross imbalance of assets, I would permit the trial court to order the advance of defendant's costs associated with discovery from plaintiff. Should the plaintiff succeed on the merits, these payments would be refunded.
Third, if the plaintiff is actually able to get to a trial on the merits but loses, I would require that the defendant be awarded the full costs of his defense as a matter of course without exception. This remedy permits the defendant to retain counsel on a basis similar to the "contingent fee" arrangement so prevalent in tort actions by plaintiffs. Furthermore, if after the trial it becomes apparent that the plaintiff actually was using the legal process in the same despicable way that he had alleged the defendant had, namely, to oppress citizens who have legitimately exercised first amendment rights, then the courts should exercise their equitable powers to impose costs against the plaintiff in excess of the actual costs of defending the case. See W.Va.Code, 59-2-11 [1923]; W.Va.R.Civ.P. 54(d).
The effective exercise of first amendment rights requires immunity from liability for good faith and negligent false statements, but there must be some protection against the deliberate lie. Some balance must be struck which allows the one to proceed uninhibited while also punishing those who hide irresponsible and malicious actions behind the guise of first amendment *48 freedom. I am disappointed that the majority of this Court did not take this occasion to fashion remedies which would address more fairly both aspects of the first amendment problem and allow redress for malicious attacks. I have outlined procedures that will essentially be cost-free to defendants in these cases and, therefore, should prevent suits of this kind from deterring citizens from exercising their rights. Without coming to any conclusions about the merits of the claim presented by DLM, I would have denied the writ and sent the case back to the circuit court for further evaluation and a determination about whether there is reasonable cause to believe that the defendants acted maliciously and so are not entitled to absolute immunity for their actions.
NOTES
[1] On September 10, 1980, the trial court did dismiss Mountain Stream Monitors as a defendant because it is not an entity subject to suit. The petitioners argue that because Mountain Stream is the only named defendant alleged to have published the newsletter of which the respondent complains, the issues raised by the newsletter are no longer before the court. As the petitioners concede, however, an expansive reading of the complaint would include the petitioner Webb as one of the parties publishing the newsletter. Accordingly, we will address the issues raised by the newsletter. In any event, the respondent's complaint could be amended to include other defendants and the same questions would be raised again.
[2] For existing coal mine point sources, OSM's limitations require a pH factor between 6.0 and 9.0 and an iron content no higher than 7 milligrams per liter. 30 C.F.R. § 715.17(a) (1979). Almost all of the measurements taken showed that the pH factor was below 6.0, indicating high acidity. The iron content ranged as high as 133 milligrams per liter. DLM's Complaint, Ex. IV.
[3] EPA regulations for issuing permits have been twice superseded since the promulgation of the regulations in effect when Webb requested a hearing. See 44 Fed.Reg. 32927 et seq. (June 7, 1979) and 45 Fed.Reg. 33484 (May 19, 1980). Changes reflected in the new regulations do not materially alter the procedure insofar as this case is concerned.
[4] West Virginia's constitutional provisions respecting the right to petition warrant that we give even greater room for activities alleged to be protected by the right. Our constitution not only expressly guarantees the right to petition under the provisions of article III, section 16, but article III, section 2 provides: "All power is vested in, and consequently derived from the people. Magistrates are their trustees and servants and at all times amenable to them". Moreover, article III, section 3 reserves to the people an "inalienable and indefeasible right to reform, alter or abolish [the government] in such a manner as shall be judged most conducive to the public weal". "This section is reluctantly but nevertheless commonly held by political scientists and constitutional lawyers as a reservation of the right of revolution under certain circumstances to the sovereign people". Shobe v. Latimer, W.Va., 253 S.E.2d 54, n.7, at 61 (1979). Thus, while the United States Constitution guarantees to the people the right to petition all branches of government, the West Virginia Constitution also gives the people the right to "reform, alter or abolish" it.
[5] The "full panoply" of citizens' rights provided by the Surface Mining Act includes the right of a citizen to comment on proposed regulations, 30 U.S.C. § 1251 (Supp. III 1979); to participate in public hearings preceding the approval or disapproval of state mining control programs, 30 U.S.C. § 1253 (Supp. III 1979); to object to mining permit applications or revisions and to request informal hearings on such applications, 30 U.S.C. § 1263 (Supp. III 1979); to comment on proposed coal explorations, 30 C.F.R. § 776.12(b) (1979); and to petition for designation of particular areas as unsuitable for surface mining, 30 U.S.C. § 1272(c) (Supp. III 1979). With respect to the actual enforcement of the provisions of the Surface Mining Act and the regulations promulgated under it, a citizen is authorized to provide information to OSM concerning possible violations of the statute or regulations, 30 U.S.C. §§ 1267(h); 1252(e)(2) (Supp. III 1979); to accompany OSM on any mine inspection undertaken in response to such information, 30 U.S.C. § 1252(e)(2) (Supp. III 1979) (during the interim period); 30 U.S.C. § 1271(a) (Supp. III 1979); to challenge the adequacy of such inspections, 30 C.F.R. §§ 721.13(c), (d); 842.15 (1979); see also, 30 U.S.C. § 1267(h) (Supp. III 1979); 30 C.F.R. § 842.14 (1979); and to obtain from OSM a written statement of the reasons for its final disposition of a case investigated because of information supplied by that citizen, 30 U.S.C. § 1267(h) (Supp. III 1979); 30 C.F.R. § 721.13(c), (d); § 842.14; § 842.15 (1979). Moreover, any citizen "adversely affected" is authorized to bring suit in the appropriate United States district court against the United States, any federal or state regulatory authority, or "any other person" to correct any violation of the rules, regulations, orders or permits issued pursuant to the Surface Mining Act. 30 U.S.C. § 1270 (Supp. III 1979).

The comprehensiveness of these citizen participation provisions reflects the considered judgment of Congress that: "The success or failure of a national coal surface mining regulation program will depend, to a significant extent, on the role played by citizens in the regulatory process." S.Rep. No. 128, 95th Cong. 1st Sess. 88 (1977). H.R.Rep. No. 218, 95th Cong., 1st Sess. 88 (1977), U.S. Code Cong. & Admin. News 1977, pp. 593, 625. See also, Note, Citizen Participation in the Regulation of Surface Mining, 81 W.Va.L.Rev. 675 (1979); Comment, Public Participation Under the Surface Mining Control and Reclamation Act of 1977: A Panoply of Rights, XV Land & Water L.Rev. 503 (1980).
The Clean Water Act likewise expressly provides for extensive citizen participation:
Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established by the Administrator or any State under this chapter shall be provided for, encouraged, and assisted by the Administrator and the States. The Administrator, in cooperation with the States, shall develop and publish regulations specifying minimum guidelines for public participation in such processes.
33 U.S.C. § 1251(e) (1976).
In reporting out the bill that ultimately became the Clean Water Act, the House Committee on Public Works expressly stated the Congressional intention that citizen participation be encouraged and fostered:
It is with the understanding that steps are necessary to restore the public's confidence and to open wide the opportunities for the public to participate in a meaningful way in the decisions of government, that the Committee has included in the proposed legislation various steps to arrive at this goal. H.R. Rep. No. 911, 92nd Cong., 2d Sess. 132 (1972). See also, S.Rep. No. 414, 92nd Cong., 1st Sess. 12 (1971), U.S. Code Cong. & Admin. News 1972, p. 3668.
Among those steps are provisions for public participation in the development, revision, and enforcement of regulations, standards, and effluent limitations, 33 U.S.C. § 1251(e) (1976). See 40 C.F.R. §§ 25.1-25.14 (1979); submitting information to the Administrator of EPA for the purpose of initiating enforcement proceedings, 33 U.S.C. § 1319 (1976 and Supp. III 1979); opportunities for public hearings on permits and other decisions, 33 U.S.C. §§ 1342(a)(1) and (b)(3); 1326(a); 1328(a) (1976); and citizen suits against any person alleged to be in violation of a standard, limitation or order issued pursuant to the Clean Water Act or against the Administrator of EPA for failing to perform his duties under the Act, 33 U.S.C. § 1365 (1976). Moreover, the EPA regulations require that the EPA and state agencies shall "provide for, encourage, and assist the participation of the public" in their activities. 40 C.F.R. § 25.3(a) (1979). In particular,
Each agency administering a permit program shall develop internal procedures for receiving evidence submitted by citizens about permit violations and ensuring that it is properly considered. Public effort in reporting violations shall be encouraged, and the agency shall make available information on reporting procedures. The agency shall investigate alleged violations promptly. 40 C.F.R. § 25.9 (1979).
Further, it is the objective of EPA and other agencies carrying out responsibilities under the Act to "encourage public involvement in implementing environmental laws" and to "foster a spirit of openness and mutual trust among EPA, States, substate agencies and the public." 40 C.F.R. § 25.3(c)(4), (6) (1979).
[6] Even in Arlington Heights National Bank, supra, the court held that a complaint seeking to impose liability for petitioning activity must be dismissed where "actual malice" is not pleaded with the requisite specificity. The Illinois Supreme Court held that failure to plead "factual allegations from which actual malice may reasonably be said to exist as opposed to the bare assertion of actual malice" required dismissal of the complaint. 229 N.E.2d at 518. The court also held that "malice is not sufficiently pleaded by simply repeating that epithet without any facts tending to support that conclusion," Id., and that

ill-will alone is not enough to establish actual malice and there must be a desire to harm, which is independent of and unrelated to a desire to protect the acting party's rights and which is not reasonably related to the defense of a recognized property or social interest. Id.
Because of the importance attributed to the First Amendment right to petition, both to the individual petitioner and to our republican form of government, courts have been reluctant to permit plaintiffs to subject persons exercising petitioning rights to the risks and burdens of litigation upon the mere allegation that their activities were intentional or "malicious" or that their communications were knowingly false. To permit such allegations, without more, to survive a motion to dismiss would impermissibly chill the exercise of the right to petition and discourage "even those who acted without malice." Sierra Club v. Butz, supra, 349 F.Supp. at 938. Additional decisions granting motions to dismiss, despite sham allegations, are Weiss v. Willow Tree Civic Assoc., 467 F.Supp. 803 (S.D.N.Y. 1979); Wilmorite Inc. v. Eagan Real Estate, 454 F.Supp. 1124 (N.D. N.Y.1977); Mountain Grove Cemetery Assoc. v. Norwalk Vault Co., 428 F.Supp. 951 (D.Conn. 1977); Cow Palace Ltd. v. Associated Milk Producers, 390 F.Supp. 696 (D.Colo. 1975); Sierra Club v. Butz, 349 F.Supp. 934 (N.D.Cal.1972); Rudoff v. Huntington Symphony, 91 Misc.2d 264, 397 N.Y.S.2d 863 (N.Y.App.1977).